CASSEL and another, Copartners, Respondents, vs. NEWARK INSURANCE COMPANY and others, Appellants.

*October 11—November 7, 1956.*

For the appellants there was a brief by *Kenneth M. Kenney, Wolfe, O'Leary & Kenney,* all of Milwaukee, and *Francis J. Wilcox,* and *Wilcox & Sullivan,* all of Eau Claire, and oral argument by *Kenneth M. Kenney* and *Francis J. Wilcox.*

For the respondents there was a brief by *Slocumb, Bundy, Carey & Solberg* of Menomonie, and oral argument by *Ronald J. Carey.*

MARTIN, J. The policies here involved covered loss by hail, stating that the insurer should not be liable "unless the building covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct force of wind or hail, and then shall be liable for loss to the interior of the building, or the property covered therein as may be caused by water, rain, snow, wind, or dust entering the building through the openings in the roof or walls made by direct action of wind or hail."

Plaintiffs' shop occupied the ground floor and basement of a two-story brick building in the city of Menomonie. The building was L-shaped and had a flat roof 90 feet long and 30 feet wide at the base of the "L," and at the inside angle of the "L" was a seven-inch floor drain which tapered to six inches. The roof pitched down toward the drain at the rate of approximately one to one and a half inches per foot.

Herbert Schneck applied the roof covering in June of 1951. The covering consisted of felt tar paper laid "double coverage," and brushed with tar. The roofing paper was flashed up the side of the parapet walls to an average of six to seven inches above the roof and it was bonded to the wall with "Quick-set," an adhesive or binder, and pressed to the wall by the use of an 80 to 90-pound roller. A heavy metal counterflashing, which had been set between the courses of the brick of the wall, lapped over the tar-paper flashing and protruded somewhat from the wall. The evidence is undisputed that the roofing was applied in an approved manner.

Mr. Schneck, who testified as an expert, was hired by the building owner to inspect the roof each spring and fall; the last inspection preceding the loss had been made in October of 1953. He stated that at that time he examined the flashing by running his hands underneath the metal counterflashing and found it was attached to the parapet walls and "in A-1 shape."

Between 8:30 p. m. on April 14, 1954, and 10:30 a. m. the next day, a precipitation of 4.8 inches was recorded by the United States weather observer stationed about ten blocks from the plaintiffs' store. The rainstorm was accompanied by a southeast wind described as "very hard" and "terrific," and at least three downfalls of hail of "marble size." Chris Haase, owner of the building, testified that at about 10:30 p. m. there was one to two inches of hail on the sidewalks and streets. Dr. J. E. Ray, expert witness for the plaintiffs, testified that the fall of hail was so "terrific" that he shoveled it off the walk with a snow shovel so that he could drive out his car. Plaintiff Frank Cassel was bowling on the night of April 14, 1954, and testified that at 10 p. m., when he left the bowling alley, hail was piled upon the sidewalks and in the center of the street to a depth he estimated at three or four inches.

Frank Cassel arrived at the store between 10 and 10:30 that night, after Mr. Haase, and found water was falling from the ceiling over about three fourths of the floor area. Mr. Schneck, who had been called by Mr. Haase, testified he went upon the roof and noticed standing water in the area of the deck drain approximately 10 inches deep; he reached into the drain and found it filled with hail from the top of the drain to the elbow, which Exhibit 21 shows to be 18 inches from the roof level. On forcing his arm down, the hail and water started moving down. In the elbow of the drain he found "a little bit of a can" which was lodged in the elbow.

Schneck returned to the roof the next morning and examined it. He found no damage to the roof but noticed two

breaches, which he called "fish mouths," between the wall and the paper flashing, one at a point next to the drain and the other just around the corner from it. One opening he estimated as 18–20 inches long and the other between 36 and 40 inches long. On a later visit he cut the paper where it was loose from the wall and observed that the adhesive was still sticky.

The first question is whether the evidence is sufficient to support the jury's determination that the "direct force of hail" caused the openings in the roof, as indicated by the "fish mouths" described.

As recited above, several witnesses testified that there was an unusually heavy fall of hail during the evening of April 14, 1954, together with a great deal of rain. The wind was "terrific," and in this regard it may be noted that the wind came from the southeast and the points at which the roof flashing was later found to have separated from the wall were on the south and east sides of the parapet wall. It may also be noted that the metal counterflashing was inserted higher on the wall at these points, leaving a greater area of the tar-paper flashing exposed than at other places on the roof. The evidence shows that in close proximity to the separations is located a 36-inch-square skylight with a smooth, plastic, dome-shaped cover, which defendants argue would protect the flashing from hail. On the contrary, it could be inferred that the skylight cover added to the impact of the hail by deflecting it toward the wall.

It was the opinion of Mr. Schneck, testifying as an expert, that the "terrific hail" jarred or knocked the flashing loose from the wall.

Plaintiffs also called Dr. J. E. Ray, professor of industrial education and drafting at Stout Institute, who had examined the roof on the occasion that Schneck cut the paper flashing at the "fish mouths." Dr. Ray testified:

"I noticed there was adequate 'stay-tite' or 'stick-tight' between the wall and in the flashing—there was plenty material there, because you could see they were both bonded completely, but it pulled away, either by pressure or pounding or something."

After describing in detail the portion of the roof where the openings were found and testifying as to the severity of the rain and hailstorm of April 14, 1954 (he estimated that about a foot and a half of hail fell that night), Dr. Ray was asked this hypothetical question :

"Now, Dr. Ray, assuming that the roof on the Cassel building was installed during the year of 1951, in the form it appeared when you first saw it, excepting all of the roofing flashing had been sealed to the brick, and assuming that the junction between the composition flashing and parapet wall were intact on or about October of 1953, and assuming that the highest precipitation on any one day between October, 1953, and April 14, 1954, was 1.32 inches and assuming that no hail fell during said period of time and assuming that the maximum temperature during that period of time was 88 degrees and the minimum temperature was 20 below zero and assuming that on the evening of April 14, 1954, a hail and rainstorm occurred and at the magnitude which you observed there on that evening and assuming in the morning after the hailstorm it was discovered that the roof flashing was separated from the brick parapet wall on the Cassel building, as you observed it later on, do you have an opinion as to what caused the separation of the roofing from the brick wall?"

And gave the following opinion :

"My opinion is that the driving hail created pressure there along with the water—the pulling that came at that time, because everything sloped and the pressure was all in one place."

Dr. Ray further testified that he examined the entire roof and found no other openings. He stated that the application of the roofing was a "first-class job." On cross-examination

he was asked whether the pressure of ice on the roof might not have caused the damage and he explained that in such an instance the whole area would be covered with ice and the pressure would be constant over the entire roof whereas the pressure of water would concentrate in the vicinity of the deck drain because of the pitch of the roof. He stated that he thought the hail came before the water accumulated in the area of the drain.

Defendants submit that a proper foundation had not been laid for the hypothetical question, but a reading of the record indicates that there is no merit to the proposition. They argue that Dr. Ray acknowledged that in reaching his opinion he had assumed "the storm was initiated with the downfall of hail, which is contrary to the undisputed evidence." This statement is inaccurate. Dr. Ray testified he assumed the hail fell before the water accumulated on the roof.

In our opinion this is the only assumption that would be reasonable under all the circumstances. It is a matter of common knowledge that ice will float on water. If the hail had fallen after the water accumulated, it would have stayed on the surface of the water. Yet it is undisputed that when Schneck went on the roof the night of the storm he found no hail at all on the roof but the drain was filled with it down to the elbow. The only conclusion one could reach is that the hail, whether it fell before the rain or after, collected in the drain and lodged there so firmly that when the water later accumulated above it, it did not rise. As we recall, it was argued orally that the presence of the small can in the drain could have caused the clogging, but the evidence is that the dimensions of the can were about two and one half by four inches; the drain itself being six inches in diameter, the jury would not be compelled to believe that the can probably clogged it.

Defendants mention several other alleged probable causes. It was testified that deterioration of the roofing and flashing

occasioned by severe winter weather could have accounted for the pulling away of the flashing, but defendants failed to introduce any evidence of such deterioration. They point to testimony of Schneck that adhesive such as was used to bind the paper flashing to the wall can lose its seal after a few years, but they failed to show that it did. On the contrary, Dr. Ray testified that when the roofing at the "fish mouths" was cut open, the adhesive was adequate and its condition such as bonded the wall and the flashing together "completely." Defendants further argue that Dr. Ray admitted that separations between flashing and wall could be caused by something other than hail, but defendants failed to elicit from him any evidence that the separations were probably caused by something else.

One of defendants' expert witnesses who examined the roof in August of 1954, when photographs were taken, testified that on the basis of such examination it was his opinion that the separations were not caused by hail and added, "I see no evidence in the pictures of indentations along the bottom that would cause the top to pull out." The other expert witness for the defendants, who examined the roof on the same day, testified that he found no dents or depressions in the roof in the area of the separations and saw no sticky material on the back of the roofing that was loose. Dr. Ray had testified that after the air hits the adhesive it hardens.

So far as the evidence of defendants' witnesses conflicted with that of the plaintiffs', it was for the jury to resolve. While defendants argue that there were other probable non-actionable causes of the damage, there is no evidence that such causes probably existed. We consider the evidence ample to support the jury's finding that the hail caused the damage. The testimony of the strong wind directing an unusually heavy downfall of hail toward the area of the roof where the openings occurred was such as the jury might well conclude

that the roof received a severe pounding which jarred the flashing loose, as testified by Schneck, and this, coupled with the clogging of the drain by the hail and the resultant pressure of accumulated water, caused the openings between flashing and wall, as testified by Dr. Ray.

Defendants also contend that the evidence fails to support the amount of damages found by the jury. The policies involved limit coverage:

". . . to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss."

Exhibit 10 is an inventory memoranda setting out the number of various items, unit cost and total cost, amounting to $14,384.08, which plaintiff Frank Cassel testified represented the cost of the merchandise and supplies damaged. He also testified that the actual salvage recovery amounted to $5,909.45, as shown on Exhibit 11, and that expenses incurred in connection with such salvage recovery totaled $731.73.

Mrs. Cassel, after qualifying as an expert, testified in answer to the question:

"Do you know to a reasonable certainty what it would have cost you to replace the damaged merchandise if it had been available, of like kind and quality, on your display racks to make it ready for sale on April 14, 1954, before the water damage? *A.* I think a reasonable figure would be sixteen thousand dollars."

On the question of damages the court instructed the jury:

". . . in arriving at your figure you are to first determine the fair market value of the property before it was damaged. Then you are to determine the fair market value of the property after it had been damaged and the difference between these two amounts will be the plaintiffs' damage.

"The term 'fair market value' as used in connection with the value of articles of personal property means the sum at which said articles would ordinarily bring at private sale, assuming that the owner was ready and willing to sell, but not obliged to sell and that there was a buyer willing and able to buy, but not obliged to buy, the price that these two parties would ordinarily agree upon under such circumstances would be the fair market value of the property."

Defendants argue that this instruction did not require the jury to determine "actual cash value." We cannot agree. A retailer's actual cost of merchandise is more than the wholesaler's charge. It includes such further costs as freight and handling and thus its actual cash value in the hands of the retailer is its replacement value. And this is the plain meaning of the policy provision. Mr. Cassel testified that the inventory cost of the damaged merchandise was $14,384.08; Mrs. Cassel testified that replacement value was $16,000, and the jury was entitled to consider this. However, taking the $16,000 figure, the jury was required by the evidence to deduct the net salvage recovery, $5,909.45 less $731.73, or $5,177.72. The maximum figure which the evidence supports would thus be $10,822.28. The jury awarded damages of $11,000, which must be reduced to $10,822.28.

*By the Court.*—The judgment is modified to reduce the damages from $11,000 to $10,822.28 and, as so modified, it is affirmed. Appellants to pay costs.