**WISCONSIN SCREW COMPANY,**
Plaintiff,

v.

**FIREMAN'S FUND INSURANCE COMPANY, Chris. Schroeder & Son, Inc., and Civic Finance Corp. of Wisconsin,**
Defendants.

### No. 58–C–11.

United States District Court
E. D. Wisconsin.

Oct. 19, 1960.

Opinion with Respect to Interest
Jan. 19, 1961.

Jacob Weisman, Racine, Wis., Norman Skogstad, Martin J. Torphy, Milwaukee, Wis., for plaintiff.

John P. Gorman, Clausen, Hirsh, Miller & Gorman, Chicago, Ill., Reginald W. Nelson, Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., for defendants.

TEHAN, Chief Judge.

This is an action by the Wisconsin Screw Company, a Wisconsin corporation, engaged in the business of manufacturing screw machine products, with its principal place of business in the Town of Mount Pleasant, Racine County, Wisconsin, against Fireman's Fund Insurance Company, a California corporation, on three policies of fire insurance. Chris. Schroeder & Son, Inc., insured under a standard mortgage clause which is a part of each policy, and Civic Finance Corp. of Wisconsin, insured under a loss payable clause attached to each policy, are also named as parties defendant.

This action, originally commenced in the Circuit Court of Racine County, Wisconsin, was removed to this court and on motion of the plaintiff, the case was advanced for trial. The trial consumed 26 days, and following completion of the transcripts and filing of briefs, final arguments were heard. The court has reviewed the transcript of testimony, the exhibits admitted into evidence and the pleadings, and has considered the briefs presented and the arguments of counsel, and is now prepared to render its decision.

The three policies of fire insurance issued to the plaintiff by the defendant insurer and involved in this case are Policy No. 467868 issued August 22, 1954 in the amount of $176,067, Policy No. 559823 issued August 22, 1955 in the amount of $276,067, and Policy No. 859831 issued August 22, 1956 in the amount of $326,066. All three policies insured the plaintiff against loss or damage by fire to Buildings Nos. 1, 2, 3 and 4,[1] situated on the east side of the Chicago & Northwestern Railroad between Twenty-first and Twenty-second Streets, Racine, Wisconsin, and to the property of the plaintiff located therein for a period of three years, and all three policies contained a 90% co-insurance clause.

The policies were obtained by the plaintiff through Chris. Schroeder & Son, Inc., agent for Factory Insurance Association, an association of capital stock insurance companies handling large lines of insurance, primarily industrial properties. The defendant insurer is a member of that association. In February, 1957, and for some time prior thereto, Anthony Walish, Manager in charge of Chris. Schroeder's Fire Insurance Department, pursuant to regular procedure in his office, had been suggesting to Calman S. Pruscha and Robert L. Susnar, sole stockholders of the plaintiff corporation, that a review of their insurance program would be in order. These suggestions culminated in a meeting between said stockholders and representatives of Chris. Schroeder being held on February 25, 1957. On that date on the basis of figures submitted by Mr. Pruscha and Mr. Susnar, and as a result of that meeting, Policy No. 467868 was increased to $350,000, Policy No. 559823 was increased to $450,000, and Policy No. 859831 was increased to $500,000, a total increase in coverage of $521,800, from $778,200 to $1,300,000. * * *

On Sunday evening, April 28, 1957, before the expiration date of the policies and slightly more than two months after the amount of coverage afforded thereby had been substantially increased, the insured premises were struck by fire. Considerable damage was done to both the building and its contents. The contents of the building consisted principally of machinery and tooling.[2]

Most of the plaintiff's records were burned, and little information was adduced during the trial concerning the background of the machinery and tooling. Its cost to the plaintiff was not revealed, nor were the manner in which the plaintiff acquired the property or the dates of acquisition ascertained. It appears, however, that the plaintiff acquired most of its machinery on the used machinery market. The age of the machinery was, in many cases, not known, but the instances in which the age could be estimated (Exhibit 143) reveal that the machinery fell into two main categories. The first of these categories is machinery manufactured before 1930. The second is machinery manufactured between 1940 and 1944.[3]

On or about October 16, 1957, the plaintiff submitted its proofs of loss to the defendant insurer (Exhibits 157, 158 and 159 accompanied by detailed schedules of the insured property. These schedules, prepared by Strauss-Zahn Company, a firm of insurance counsellors and adjusters, listed property completely destroyed by the fire, property partially destroyed, and property which was undamaged, and set forth the appraisers' opinion of the replacement value and sound value immediately before the fire of each item and the amount of loss of

1. Although designated in the policies as four buildings, the insured property was in reality one building and the additions thereto.

2. "Tooling" as used herein includes machine parts, perishable tooling and nonperishable tooling.

3. The testimony reveals that the plaintiff made large purchases of used War Assets Corporation machinery after World War II.

sound value sustained by those items which were wholly or partially destroyed.

The proofs of loss were rejected by the defendant insurer on December 10, 1957 (Exhibit 160) on the grounds that the plaintiff had overstated the value of the property and the amount of its loss. Shortly thereafter, this action, in which the plaintiff seeks to recover $1,284,646.-27, was commenced.

In its amended answer the defendant insurer has denied that the plaintiff sustained a loss in the amount set forth in the complaint and as affirmative defenses alleges (1) that at the time of the fire, coverage under the policies was suspended because of an increase in hazard, and (2) that the policies are void because the plaintiff submitted fraudulent proofs of loss. The defendant has also alleged that the plaintiff has assigned all of its right, title and interest in and to the proceeds of the policies to Martin J. Torphy and Daniel W. Howard, who, it claims, are necessary and indispensable parties to this action, (Exhibit 177) but has not pressed this defense.

As heretofore stated this trial lasted 26 days. The transcript of the proceedings was over 3,000 pages long. A substantial number of exhibits were admitted into evidence. Under these circumstances we believe it would be helpful to set out the evidence, including extracts from the testimony at more length than ordinarily would be the case.

### Affirmative Defense of Increase of Hazard

■ All three of the policies here involved contained the following provision respecting suspension of coverage due to increase of hazard:

"Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured; * * *."

As we have stated, the policies were obtained by the plaintiff through the Factory Insurance Association, an association of which the defendant insurer is a member. Before the plaintiff could qualify as a "superior form" or "highly protected" risk so as to enable it to obtain insurance through F. I. A., it was required to comply with certain basic requirements, one of which was that it be properly protected by well-maintained sprinkler equipment. This requirement obtained when the policies in suit were issued.

The defendant insurer contends that at the time the policies in suit were issued, the insured property was protected against loss by fire by two dry pipe sprinkler systems, that the north sprinkler system, protecting that section of the plaintiff's main building housing the major portion of the machinery and tooling damaged by the fire of Sunday night, April 28, 1957, was shut off and not operating at the time of the fire, that by reason of the failure of the north sprinkler system to be in operating condition, the hazard to the premises of the insured was increased, that the increase of hazard was caused by means within the control of the insured, and that, because of the increase of hazard existing at the time of the fire, the insurance was suspended at that time and the plaintiff is not entitled to recover under any of the policies.

\* \* \* \* \*

The evidence presented on the increase of hazard issue reveals that the north sprinkler system was in proper operating condition and the north post indicator valve controlling the flow of water to that system was open after the broken sprinkler head was repaired on Thursday, April 25, 1957. The evidence further establishes that the north post indicator valve was closed when it was checked by Mr. Zenner, Mr. Christianson and Mr. Zahn between 1:00 and 2:00 A. M. on April 29, 1957, immediately after the fire. No evidence was presented, however, to show when the valve was closed.

The defendant insurer wishes us to infer that the valve was closed when the

fire started from the testimony of Mr. Schirott, Mr. Nelson, Mr. Blanton and Mr. Jahn, all of whom testified to facts which could be said to establish that no water flowed through the system at the time of the fire. The evidence revealed, however, that water pressure in the main feeding the sprinkler systems was low, and in fact failed completely at about 10:30 P.M. The inference that the north sprinkler system failed to operate due to lack of water pressure is to us at least as reasonable as the inference that it failed to operate because the north post indicator valve was closed, particularly since it appeared that the north system was served only after water had passed the yard hydrant and through the south system.

We recognize that the failure of water pressure alone would not account for the fact that the north post indicator valve was found in a closed position after the fire. However, in a situation where there is no direct evidence that the post indicator valve was in a shut position before the fire and the evidence reveals that there was not only opportunity for someone to manipulate the valve but reason so to do, we cannot make such a finding. The south post indicator valve was uncontrovertedly open at the commencement of the fire, yet it too was found to have been turned off during and after the fire and both of these valves were in the same general area. Since it appears most clear that a situation of low water pressure existed that night, it is certainly as likely that it was turned off by one of the number of people in the excitement of the fire, as that it was in an off position prior to the fire.

For the reasons stated, we must conclude that the defendant insurer has failed to establish by a preponderance of the evidence that the north sprinkler system failed to operate at the commencement of the fire because the north post indicator valve was closed.

Prior to the trial, the defendant insurer stipulated that as of the date of the stipulation it could adduce no evidence that the plaintiff had actual knowledge that the north sprinkler system was inoperative, and no such evidence was presented at the trial. The plaintiff contends that under Wisconsin law (Joslin v. National Reserve Insurance Company of Illinois, 1930, 201 Wis. 506, 230 N.W. 711, an increase of hazard will not render a policy void unless it is within the knowledge of the insured, therefore, even if the north sprinkler system was inoperative at the time of the fire, the policy was not voided since the defendant insurer did not prove that the plaintiff knew of the increase of hazard. Because in our opinion, arrived at after a consideration of all of the evidence submitted by the defendant insurer in support of the affirmative defense of increase of hazard, the defendant insurer has failed to prove by a preponderance of the evidence that the north sprinkler system was not operating at the time of the fire, we find it unnecessary to consider the plaintiff's contention in this respect.

### Extent of Plaintiff's Damages.

The three policies issued by the defendant insurer upon which the plaintiff here seeks to recover provide that the plaintiff is insured:

> " * * * to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, * * *."

There is sharp dispute as to the "actual cash value" of the insured property immediately before the fire of April 28, 1957, and as to the amount of loss the plaintiff sustained by reason of the fire. When the plaintiff submitted its Sworn Statements in Proof of Loss to the defendant insurer, it claimed that the sound value of the insured property was $1,658,371.14 and that the loss sustained was $1,474,906.38. Since the policies all contained a 90% co-insurance clause, and totalled only $1,300,000, the plaintiff admitted that if its figures were accepted,

it was under-insured and its recovery should not exceed $1,284,646.27. The defendant insurer, on the other hand, claims that the insured property had a sound value of $742,339.35 and that the loss sustained was $668,178.47. A determination of the actual cash value of the insured property and the loss is essential not only on the question of what damages the plaintiff sustained but also on the question of whether the plaintiff submitted fraudulent proofs of loss which voided the policies, a question which we shall discuss later.

The parties are agreed that under Wisconsin law policies of insurance are contracts of indemnity. Ramsdell v. Insurance Company of North America, 1928, 197 Wis. 136, 221 N.W. 654. They are also agreed that in the event of loss and in the absence of any valid defenses, the insured is entitled to recover that amount which will place it in the same financial position it would have been in had no fire occurred. They further agree that "actual cash value" as used in the policies means that amount which will accomplish indemnification. Here agreement stops as the parties differ in their opinions of the proper manner of determining "actual cash value".

It is the position of the plaintiff, arrived at by reasoning which we shall hereinafter discuss, that "actual cash value" is "sound value" and that the only method of computing the sound value of any item is to determine its replacement value new and subtract therefrom observed depreciation. In support of this position it relies heavily upon the following definition of "Value-Sound" found on page 48 of "Basic Standards of Appraisal Practice and Procedure", a booklet published by the Association of Appraisal Executives which was admitted into evidence as Plaintiff's Exhibit 167:

"An amount representing the value of property for normal or assumed use, ordinarily based upon the cost of reproduction (or replacement), less observed accrued depreciation, but without adjustment for economic conditions or lack of earning capacity. As customarily used 'sound value' is the value to a going concern which has normal use for the property in its existing condition, that is, at its 'highest and best use.'"

Counsel for the plaintiff has cited no case adopting this definition.[4]

Because the major controversy between the parties concerns the value of machinery and tooling, we shall discuss at some length the testimony concerning those items.

In line with its position, the plaintiff called at the trial four principal witnesses on the question of value of machinery and tooling, who testified as to the "replacement value" and "sound value" of the insured property immediately before the fire, and to the amount of loss of "sound value" sustained by reason of the fire.

The first of these witnesses was Edward G. Wick, who in 1957 and for several years prior thereto was an Insurance Counsellor and Adjuster for Strauss-Zahn Company, which was retained to represent the plaintiff in preparing its

4. During the oral arguments held November 5, 1959, the court asked counsel for the plaintiff whether the Wisconsin Supreme Court had adopted their view of "sound value" and was told that it had, and that the pertinent cases were cited in the plaintiff's briefs. Since the court had examined the briefs and noted no such cases, it requested counsel to point them out. On November 16, 1959, counsel addressed a letter to the court, stating in part:

"On November 5 the Court made inquiry as to whether or not there was any Wisconsin case defining 'sound value' as that term has been defined in this litigation. There is no Wisconsin case that we have been able to find, involving a fire loss, which specifically uses the language 'replacement new less observed depreciation without regard to economic conditions.'"

Although plaintiff's admission is limited to the absence of any Wisconsin cases using this specific language, no Wisconsin case using general language to the same effect has been cited or found.

proofs of loss. Wick, who had not been on the plaintiff's premises at any time prior to the fire of April 28, 1957, testified that he and Gerald Timlin, another Strauss-Zahn Company employee, began to supervise the removal of debris from the plaintiff's premises on or about May 8, 1957. Under their direction the plaintiff's machinery and tooling was moved into the yard, where he and Timlin scheduled and identified each machine and its fixtures and inventoried the tooling, tagging each item. After the identification and segregation was complete, he and Timlin, with the help of Gustave E. Zahn, determined the replacement cost new of the insured property, getting quotations from manufacturers, where possible, and, where manufacture was discontinued, trending up the last selling price to the date of the loss. The replacement value of special tooling, that is, tooling manufactured by the plaintiff itself, was based on the cost of labor to reproduce it. After the replacement values had been determined, he and Timlin proceeded to determine the sound value of and loss to each item.

\* \* \* \* \*

When cross-examined as to the manner in which he determined depreciation on any property to arrive at "sound value", Mr. Wick testified that he considered only age, condition and future utility, and never considered (1) whether the plaintiff had acquired the property new or used, (2) the market value, (3) when the property had last been used, and (4) when the property would next be used. He stated that in his opinion, property which is in such condition that it could be used had future utility.

We experience difficulty in following the approach of Wick in arriving at sound value. Although he stated that age was a factor, a study of the field notes made by his associates, Mr. Timlin and Mr. Zahn, discloses that in many instances age was not even estimated. Future utility, another factor which he said he considered, was equated by him with condition. His only real consideration, it would appear, was condition, as ascertained by him (1) from his own observations of the machinery after it was removed from the remains of the building, and (2) through discussions with the plaintiff's employees.

The second valuation expert called by the plaintiff was Gerald Bohan Timlin, another public adjuster employed by Strauss-Zahn Company. Timlin, too, had never viewed the plaintiff's premises before the fire. \* \* \*

During cross-examination, Mr. Timlin admitted that he had never before appraised any plant comparable to that of the plaintiff. He was questioned concerning the factors he considered in depreciating machinery and stated that (1) he did not check on how long various items of machinery had been in the plaintiff's plant or whether the plaintiff had acquired any of the machines in a used condition, (2) The age of older machinery had no bearing in determining depreciation,[5] (3) Maintenance and condition of older machinery was the major factor used in determining its sound value, (4) He never considered the used machinery market. Mr. Timlin also stated that, as to the older machines he gave no consideration to obsolescence,[6] \* \* \*.

---

5. Mr. Timlin considered age a factor on "practically new" machines. At one point, he stated that it was a factor when a machine was under ten years old and at another point he stated that it was a factor when the machine was ten or twelve years old. He also indicated that age was a "main factor" only when a machine was under five years old. The number of machines younger than twelve years old in the plaintiff's plant at the time of the fire was nominal.

On cross-examination, when queried relative to depreciation on certain specific machines, he admitted that the factor that induced him to give a lower value to an older machine was the age thereof, and it appears that he estimated this factor to be at the rate of 5% a year.

6. Although he was questioned only concerning certain machines, his answers indicate that obsolescence was never a factor.

Timlin was also cross-examined on the manner in which he arrived at the "sound value" of tooling. He stated that he did not determine the age of the tooling or ascertain when any of the tooling had been used last or would be used again. Neither did he attempt to determine whether the tooling was used when the plaintiff acquired it. He stated that he made no attempt to determine whether the amount of tooling accumulated was excessive when compared with the number of machines owned by the plaintiff. Nor did he ascertain whether some of the tooling had been obtained by the plaintiff along with used machines which it purchased. Although he did not know when the tooling was last used or would be used again, he did not consider obsolescence a factor, * * *.

Timlin's testimony furnished no more of a standard as to the manner of arriving at a proper rate of depreciation to determine "sound value" than did Mr. Wick's. Although he repeatedly stated that he arrived at a "sound value" which he believed to be "fair" or "conservative", he used no objective standards other than condition as relayed to him by the plaintiff's employees.

The plaintiff also called as a witness Gustave E. Zahn, whom Timlin employed to assist in the preparation of the plaintiff's proofs of loss with respect to machinery. Zahn is an appraiser specializing in metal working machinery who has been employed by the American Appraisal Company since 1916.

* * * * *

Zahn assisted in determining the replacement value new of the machinery, particularly that machinery the manufacture of which had been discontinued.

* * * * *

Plaintiff's final major witness on the question of value of machinery and tooling was Todd Maynard, a machinery rebuilder, who was retained by the plaintiff in November, 1957, to appraise the loss to its machinery and tooling, at which time he had his first view of the plaintiff's premises. * * *

In general, in respect to machinery Maynard testified that he obtained a replacement value for each machine, and arrived at "sound value" by deducting therefrom observable depreciation. His appraisal of the loss sustained to machinery exceeded by over $160,000 the figure in the Strauss-Zahn Company schedule which formed a basis for the plaintiff's proofs of loss, despite the fact that in making his appraisal, he followed substantially the same formula as Timlin, Wick and Zahn.

Maynard also appraised the tooling item by item. He appraised only those items damaged by the fire and arrived at a loss figure of $425,267.23, about $56,000 less than Strauss-Zahn Company's appraisal of the loss.

* * * * *

Maynard never inquired whether the plaintiff had acquired any of its machinery used and never considered obsolescence. He took into account, in arriving at sound value, only observable depreciation. Unlike Zahn and Timlin, his rate of depreciation on machinery did not represent a loss of useful life.

Depreciation on tooling, also, was arrived at solely by observation of its physical condition after the fire and on the assumption that all of the tooling was in use, or had a use in the near future and was not obsolete.

The defendant insurer contends that the Court is not shackled to a single, rigid formula in determining the actual cash value of the insured property and the amount of loss, but may consider every fact and circumstance bearing upon the question of value. In line with this view it presented a variety of evidence at the trial, evidence as to the market value of the insured property immediately before the fire, the cost of acquisition of the plaintiff's stock by its present owners, negotiations for the sale of the plaintiff's stock or assets, and other matters which it asserts to be proper considerations on the question of value and loss.

The first witness testifying as to matters propounded by the defendant in-

surer as indicative of value was Calman S. Pruscha, President of the plaintiff corporation since August, 1946, and holder of 50% of its outstanding stock, who was called adversely on behalf of that defendant. Mr. Pruscha, who handled the financial end of the plaintiff's business and had no part of operating its plant or obtaining business, testified that he and three other persons each acquired 25% of the plaintiff's stock in 1946 for a total price of $325,000. He was unable to estimate the capital expenditures made since that time. In 1950, he stated, he and Robert L. Susnar became sole owners of the plaintiff's outstanding stock, each having 50% thereof. Pruscha was asked whether any appraisals of the plaintiff's property had been made since he acquired his interest in the plaintiff, and replied that one appraisal had been made on the building and that two appraisals had been made on the plaintiff's personal property, one in 1953 and one in 1955, both for the American State Bank by the L. L. Richards Machinery Company. He also testified that since 1946 no offer had been made by the plaintiff's officers to sell its physical assets or capital stock, with the exception of an offer to sell stock to the Union which was not seriously made nor had anyone been authorized or employed by the plaintiff's officers to sell either its physical assets or capital stock.

Robert L. Susnar, Secretary and Treasurer of the plaintiff corporation and holder of 50% of its outstanding stock, was also called as an adverse witness by the defendant insurer, and testified that, as Secretary-Treasurer of the plaintiff corporation, he signed the original proofs of loss submitted to the defendant after the fire of April 28, 1957. He testified that he and Pruscha employed Strauss-Zahn Company to prepare the schedules in connection with the loss and that he himself checked over the schedules so prepared before signing the proofs of loss.

The defendant insurer then called Harry M. Hintz as a witness, who told of conversations held with Pruscha and Susnar in July of 1950. He testified that both men expressed an interest in selling Wisconsin Screw Company and, when he told them he knew where a deal might be made, they authorized him to sell the capital stock of the plaintiff corporation for $550,000. Written authorization to sell was given to him * * *.

On receipt of this authorization, Mr. Hintz stated, he wrote * * * to Mr. Charles W. Stuart whom he thought might be interested in buying.

&ast; &ast; &ast; &ast; &ast;

It appears that Mr. Stuart was not interested, and nothing came of the contact.[7]

Another witness, Robert Krogstad, was called by the defendant insurer in an effort to show that the plaintiff's assets, including land, were offered for sale only one month before the fire for a price of $675,000. The purpose of this testimony was to reveal the owners' true estimation of the value of their corporation's property as contrasted with the cash value of the insured property, exclusive of land, as set forth in the proofs of loss, of $1,658,371.14. Mr. Krogstad, a mechanical engineer with experience in screw machine operations, testified as follows:

During the latter part of the year 1956, he was conducting a search for a business to purchase. At the suggestion of a friend, George Wherry, he contacted Jacob M. Weisman, counsel for Wisconsin Screw Company who represents that company in this litigation. He and Weisman met in the latter's office in late 1956 "to discuss if there was any area of mutual interest between Wis-

---

7. Counsel for the plaintiff moved to strike the testimony of Mr. Hintz on the grounds that it was irrelevant and immaterial, and that evidence of authorization given in 1950 was too remote. They did not attempt to explain this testimony in the light of Mr. Pruscha's denial that anyone had been authorized to sell plaintiff's stock.

consin Screw Company selling their business and our purchasing the business." (1600). At that meeting, he was furnished with an appraisal of the plaintiff's machinery and plant equipment, setting a value on that property of between $505,405 and $515,405. He subsequently made an inspection of the plaintiff's plant, accompanied by Weisman and one of the plaintiff's employees, spending several hours looking at and evaluating the equipment using the appraisal furnished to him by Weisman as a guide. He made no offer to purchase either the assets or stock of the plaintiff. Subsequently he received the following letter from Attorney Weisman (Defendant's Exhibit 189):

"March 25, 1957
"Mr. Robert Krogstad
"Route 2, Box 27
"Ft. Atkinson, Wisconsin.

"Re: Wisconsin Screw Company
"Dear Sir:

"I have not been in contact with you for a number of months. I have had several conferences with the owners of the Wisconsin Screw Company the last few days and they seemed to be interested in consummating a sale of this company if possible.

"In our last conversations you indicated that you would prefer to negotiate for the purchase of assets rather than purchase the stock of the company. The owners are willing to negotiate on a basis of the sale of assets if that is still preferable to you. They are not inclined to sell Racine Screw Company if they sell the Wisconsin Screw Company. However, that may be a subject of negotiation.

"I presume that the facts pertaining to Wisconsin Screw Company are still in your mind. If you recall, the machinery and equipment alone have been appraised for liquidation purposes at approximately $525,000.00. The land and buildings have a reasonable value of $150,000.00. In addition to the above facts, the purchaser could take advantage of a substantial tax loss. Although the business has not been operating at maximum capacity during 1956, they have a very substantial backlog of good business on hand at the present time and there is a continuous influx of substantial orders. The principle difficulty to full scale production is a lack of working capital. An analysis of the business on hand and the incoming business unquestionably will show that if the company were operated with sufficient working capital, the company could be operated very profitably.

"I have requested current up-to-date financial statements of Wisconsin Screw Company. They expected to have the figures I requested within the next two days or so.

"If you are still interested in negotiating for the purchase of Wisconsin Screw Company, I suggest you make arrangements for a conference to meet with me and the principals in an effort to arrive at a mutually acceptable price. Please let me hear from you.

"Very truly yours,
"/s/ J. M. Weisman
"J. M. Weisman
"JMW:mgd"

In respect of this letter, Krogstad testified as follows:

"A. Well, I got a letter from Mr. Weisman indicating the price that they would be interested in discussing the purchase for, and I was thinking in considerably reduced terms, and furthermore had indicated previously to him that, in my opinion, the purchase of only the Wisconsin Screw Company and not Racine Screw Company would not be to our best advantage but that

we should buy them both or nothing." (1602.)

Krogstad made no offer, stating he believed the $525,000 figure to exceed by over $200,000 the value of the equipment, and adding further that he would not consider buying Wisconsin Screw Company unless he could also buy Racine Screw Company. The negotiations between him and Attorney Weisman thereupon lapsed.

Neither Mr. Pruscha nor Mr. Susnar, the sole stockholders, was called by the plaintiff to explain or rebut the testimony regarding the authority given Mr. Hintz to sell the plaintiff's stock or to comment upon their participation in the Krogstad-Weisman negotiations. Weisman, himself, however, did at the suggestion of the court, take the stand to explain his conferences with Mr. Krogstad.

Mr. Weisman, who had been a practicing attorney since 1923 and had represented the plaintiff since 1951, explained his contacts with Mr. Krogstad as follows:

In September or October, 1956, George Wherry informed him that a friend of his wanted to buy a screw machine company, and asked whether Wisconsin Screw Company or Racine Screw Company, another screw machine products company owned by the owners of the plaintiff, might be for sale. He agreed to talk to that friend, Mr. Krogstad, and did have some discussions with him pertaining particularly to Racine Screw Company. Weisman then wrote the following two letters:

Plaintiff's Exhibit No. 257.
"October 15, 1956.
"Mr. Robert Krogstad
"Route 2, Box 27
"Fort Atkinson, Wisconsin.
"Dear Mr. Krogstad:
"I have had the Racine Screw Company figures in my possession for a little while. I have been in and out of the city so I have not had an opportunity to contact you.

"You suggested I send them to your attorney. I would like to discuss this matter before I forward these papers. I suggest you call me on the telephone and perhaps we can make arrangements for a conference in the next number of days pertaining to these matters.
"Very truly yours,
"Weisman & Weisman
"By
"J. M. Weisman
"JMW:mgd"

Plaintiff's Exhibit No. 258.

"October 30, 1956.
"Mr. Robert Krogstad
"Route 2, Box 27
"Fort Atkinson, Wisconsin
"Dear Mr. Krogstad:
"When I talked to you on the telephone, you indicated you would not be able to get in touch with me until some time this week.
"I would appreciate it very much if you contacted me upon receipt of this letter. It is rather important for me to determine what course to follow from now on relative to the matters I submitted to you.
"Very truly yours,
"Weisman & Weisman
"By
"J. M. Weisman
"JMW:mgd"

After the letters were sent, Krogstad requested information concerning the equipment of both the plaintiff company and Racine Screw Company. Because no inventory of the plaintiff's property was available, Weisman made available to Krogstad a copy of the L. L. Richards appraisal of 1953 "only for the purpose of identifying the facilities." (P. 2590.) Armed with that appraisal, he and Krogstad went to the plaintiff's plant, taking a casual walk through it while Krogstad took a look at the machinery. Some

time later, in March, 1957, he had a call from Mr. Wherry asking what had happened to the discussions with Krogstad. He told Wherry that he hadn't heard from Krogstad in a long while, and Wherry stated that he believed Krogstad was still interested and suggested that he (Weisman) contact him. As a result of that conversation, the letter of March 25, 1957, quoted above, was mailed.

Weisman further testified that the owners of the plaintiff, Pruscha and Susnar, had no knowledge of his dealings with Krogstad until a few days before the letter of March 25, 1957 was written. At that time he told them that Krogstad was interested in buying a screw machine plant, and they said they were not interested in selling but that if Krogstad had any proposition to offer they would listen. He did not tell them that he was going to include any statement in his letter relative to the value of the property but did tell them that he had submitted the 1953 appraisal to Krogstad "for the purpose at that time of acquainting him with the facilities and for no other purpose." (2604.) Pruscha and Susnar did not discuss a price at which they would consider selling, but had from time to time referred to the value of the plaintiff as being approximately $1,500,000.

Weisman further testified that he had no authority to discuss the sale of the plaintiff but that he was dealing with Krogstad with the sole purpose of submitting any proposition Krogstad might advance to the principals. He was not authorized to include any statement as to value in his letter of March 25, 1957. At the time he gave Krogstad the 1953 appraisal, he said, he was not aware of the fact that another appraisal had been made by the same appraiser in 1955, evaluating the plaintiff's personal property at over $100,000 less than the amount shown in the 1953 appraisal. The statement in the letter of March 25, 1957 to the effect that the reasonable value of the land and buildings was $150,000, Weisman stated, was his own opinion, and did not reflect the opinion of Pruscha and Susnar.

It was suggested to Weisman by the court that the statements in the letter of March 25, 1957:

> "If you recall, the machinery and equipment alone have been appraised for liquidation purposes at approximately $525,000.00. The land and buildings have a reasonable value of $150,000.00."

would have discouraged Krogstad from offering more than $525,000 for the plaintiff's personalty and in fact constituted an invitation to Mr. Krogstad to make an offer of that figure or less. He replied:

> "A. No, it was merely to show that even on a liquidation basis it had that much value, but it was no basis for any negotiations because the principals, from time to time, discussing values, referred to a sum for the company of approximately a million and a half dollars, and discussed it, and this was merely a reference to the 'liquidation values' to refresh his recollection because he had no copy of this appraisal at all." (2597.)

He was then asked why, if he had a higher sum in mind, he didn't state it, and answered that he had no authority to fix a price. He stated:

> "A. (Continuing) Incidentally, I never did discuss price with them, never got to discussion of price with them, and the last question that occurred, he said something he would rather buy assets rather than the stock of the company, and the purpose of that is merely to refresh his recollection that the liquidation figures, which we would consider the lowest possible figures that could be fixed for value of machinery, was fixed at $525,000.00." (2597-8.)

The same suggestion that was made by the court was made on cross-examination as follows:

"Q. Now, as an attorney, Mr. Weisman, practicing since 1923, I believe that was the date, and representing corporate clients such as Wisconsin Screw Company, wouldn't you expect that when you send this letter to a business man who has already expressed an interest in acquiring a screw machine company and you quote to him a price on land and a price on machinery and equipment, that that is an invitation to him that he would interpret it as an invitation to bid for the purchase of those assets somewhere within the area of those two figures? A. I had no such intention, sir.

"Q. Do you think that would motivate him to bid anything over that? A. I don't know; we never discussed price. He saw this appraisal and I was just calling it to his attention." (2602-3.)

Counsel for the plaintiff contend that the testimony of Krogstad regarding his negotiations with Weisman is inadmissible as evidence of the opinion of Pruscha and Susnar as to the value of the plaintiff's assets, first, because there is no proof that Weisman was authorized by Pruscha and Susnar to act in their behalf, and second, because such testimony has no bearing on the question of actual cash value since the only proper measure thereof is replacement cost less observed depreciation.

In respect of Mr. Weisman's activities the record discloses only that he had been the attorney for the plaintiff since 1951 and still is. He has specifically denied that he was authorized to act as the company's agent in negotiating the sale and that any definite sales price, other than $1,500,000, was mentioned by the owners. The defendant failed to question the owners adversely or to introduce other evidence in respect to Weisman's status or authority to negotiate a sale in their behalf. Under such state of the proof, we must hold that the defendant has failed to establish that the owners of the plaintiff can be charged with the admissions as to value brought out by the Krogstad-Weisman conferences and correspondence.

\* \* \* \* \*

The defendant insurer's principal appraisal witness was John R. Richards, a mechanical engineer associated with the L. L. Richards Machinery Company, the largest machine tool dealer within the State of Wisconsin. Mr. Richards, who appraised the plaintiff's machinery and equipment in 1953 and 1955, and also after the fire in 1957, was the only witness testifying as to the value of the insured property who had an opportunity to examine that property prior to the fire.

Mr. Richards described the market in used machinery as follows:

Used machinery bought and sold in the market is obtained by dealers from sources such as public auctions, trade-ins on new machinery, plants which have undergone changes in processes or products, plants which have planned replacement programs on their machines, bankruptcy sales and the Government. There is a tremendous amount of used machine tool equipment on the market. The approximately 1,000 used machine tool dealers in the United States do a total annual business of over $200,000,000. Machines are sold by his company all over the country. The company does not carry a substantial stock of used machines, but when a machine of a definite type is ordered, his company goes out into the market to find it. Trade periodicals advertising available used machines are a source of information, and contact is made with other dealers until a machine seeming to meet the customers' requirements is located. The machine is then inspected to determine its condition and is operated to check its performance. When used machines are sold, a normal

complement of non-perishable tooling is included in the price of the machine.

Mr. Richards testified that the plaintiff has itself taken advantage of the used machinery market as a customer of his company.

Richards' first appraisal of the plaintiff's machinery and equipment was made in February, 1953, at the request of the American State Bank from which, he understood, the plaintiff was seeking a loan. Appraisal of machinery was part of the work of the L. L. Richards Machinery Company. At that time, he and his father spent two or three days checking the machines with the help of the plaintiff's plant superintendent. The condition of the machines was checked by them and discussed by them with the plant superintendent. Each machine was itemized and a value was arrived at * * *.

In his 1953 appraisal, Richards evaluated the machinery at $495,405. A second appraisal was made by Mr. Richards and his father in March, 1955, again for the American State Bank using the same procedure as used in the earlier appraisal. In this appraisal, he evaluated the machinery at $360,505.

Within ten days after the fire, Mr. Richards and his father made their third appraisal to determine the value of the machinery immediately before the fire. An inspection at this time could not, Richards stated, disclose the condition of the machines before the fire because of the effects of the fire, so after discussions with the plant superintendent, he assumed the condition to be the same as in 1955 with normal maintenance and wear and tear in the interim. The value of non-perishable tooling is included in his valuation of machinery because, in Mr. Richards' experience, a used machine is normally offered for sale with that tooling. Perishable tooling, however, is not included in his estimation of value of a machine, but each appraisal contained an estimate of the liquidation value of that tooling.

\* \* \* \* \*

Richards' appraisals did not include an allowance for freight and installation of the machinery which, in his estimation, would amount to 5 to 6% of the total appraisal.

On cross-examination, Richards restated repeatedly his position that the values of machines listed by him represented the price for which the machines could be sold by him on the market with no compulsion to sell and not the price at which he, as a dealer, would purchase the machines from a seller under some compulsion to sell quickly. His appraisal was not, therefore, a liquidation appraisal as that term is generally understood and was defined by Mr. Zahn, the plaintiff's appraiser, who indicated that liquidation appraisals contemplated a forced sale. Richards stated that he made the same type of appraisal based on market value for all purposes.

Richards was cross-examined at great length concerning the nature of the used machinery market. He admitted that there were no fixed prices for certain machines around the country, but stated that dealers would not vary too greatly in the selling prices they would establish for identical machines. He also admitted that a "return privilege guaranty" was the only guaranty available on used machinery and that there was no established standard in the trade for rebuilt or reconditioned machinery. For these reasons, his company inspects used machines before purchasing them for a customer to be assured that the customer's requirements will be fulfilled. Richards also stated that when asked to furnish a certain type of machine in a defined condition to perform specified work, he could estimate "pretty close" what the price of that machine on the market would be.

Before giving his opinion of the value of the plaintiff's machinery, Richards did not determine whether each machine was available on the market. His valuation figures represented his opinion of what machines of like kind and quality could be purchased for if they were available on the market.

\* \* \* \* \*

Richards also testified that after the fire in April, 1957, he would have undertaken the job of replacing the plaintiff's machinery with machinery of like kind and quality obtained on the market for the figures set forth in his 1957 appraisal and that he could have performed the major part of that undertaking within 60 to 90 days, and could have completely performed within 120 days. When asked on cross-examination whether he would have been "willing to guarantee such performance on the part of all of these machines backed up to the satisfaction of the company and its employees, backed up by your own and company assets to back it up", he refused to state that he would risk his company's assets to guarantee performance. His refusal appeared to be based on a lack of belief in the good faith of the plaintiff, however, and not on a doubt that he could perform.

Throughout his testimony, Richards maintained that the used machinery market was an accurate gauge of the value of the plaintiff's machinery and non-perishable tooling, and that, in his opinion, the market price reflected considerations of replacement value, condition, demand, age and other factors having a bearing on value.

The defendant insurer's final major witness on the question of value of machinery and tooling was Edward C. McLean, an industrial engineer. Mr. McLean testified that he inspected the machinery and tooling after the fire, at which time the condition of the machinery could not be determined by inspection, and that he got information concerning condition from the plaintiff's employees and from one Charles Stuart, who had inspected the property before the fire. In McLean's opinion, the value of each machine was the market price thereof, which he determined from an examination of periodicals and from conversations with persons in the market, plus freight and installation.

Mr. McLean stated that in his experience the value of tooling in a shop generally amounts to 25% of the value of machinery in that shop or 10% of the replacement value new of that machinery and he estimated the value of the plaintiff's tooling at 25% of his estimation of the value of the plaintiff's machinery.

The defendant insurer has admitted that the plaintiff has accurately scheduled the machinery and tooling that was on its premises at the time of the fire, and has not included in its schedules property which was not present when the loss was sustained. It has further admitted that the plaintiff's schedules for the most part accurately set forth the "replacement value new" of the insured property. It contends, however, that the "replacement value new" was grossly under-depreciated by the plaintiff's experts in their attempt to arrive at sound value, and that therefore the sound values listed for each item are excessive. Since the great majority of items listed in the plaintiff's schedules were totally destroyed by the fire, the sound value figures arrived at by the plaintiff's experts are, in most cases, the same as the figures set forth as the plaintiff's loss.

The plaintiff's argument in support of the accuracy of its appraisal of machinery and tooling may be summarized as follows:

1. Under the provisions of the Wisconsin Standard Fire Policy, three of which are involved in this case, the defendant insurer is required to indemnify the plaintiff for losses sustained as a result of the fire of April 28, 1957.

2. Such indemnification is accomplished, under the terms of the policy, by payment to the plaintiff of that amount found to be the "actual cash value" of the property of the plaintiff which was destroyed.

3. "Actual cash value" is synonymous with "sound value".

4. "Sound value" means "replacement cost less observed depreciation", or, more completely, "an amount representing the value of property for normal or assumed use, ordinarily based upon

the cost of reproduction (or replacement), less observed accrued depreciation, but without adjustment for economic conditions or lack of earning capacity. As customarily used 'sound value' is the value to a going concern which has normal use for the property in its existing condition, that is, at its 'highest and best use.'"

5. The only experts who followed the formula set forth in (4) are the plaintiff's witnesses.

6. The court may consider only the testimony of the plaintiff's witnesses and must strike the testimony of the defendant's witnesses who did not compute "sound value" in the manner set forth in (4) above, which it is contended is the only accepted method of determining value under the Wisconsin Standard Fire Policy.

We do not agree with the reasoning of the plaintiff, for the reason that Point No. 4 of the plaintiff's argument set forth above, is not well taken. Points Nos. 5 and 6, since they are necessarily based on the validity of Point No. 4, are likewise erroneous.

The propriety of Points Nos. 1 and 2 of the plaintiff's argument cannot be questioned and has been conceded by the defendant insurer. Under Wisconsin law, policies of insurance are contracts of indemnity. Ramsdell v. Insurance Company of North America, supra. The three policies involved herein, standard policies which conform to the provisions of § 203.01, Wisconsin Statutes, provide for insurance indemnification "to the extent of the actual cash value of the property at the time of loss, * * *."

Counsel for the defendant have agreed also that Point 3 of the plaintiff's argument is correct, and that "actual cash value" and "sound value" are indeed synonymous. Since no dispute existed as to that proposition before, during, or after the trial, we find it unnecessary to discuss at length the many cases cited by the plaintiff in support thereof. We do note, however, that in none of those cases has the term "sound value" been de-fined as the plaintiff defines it in Point 4.

In Point 4, we find the fatal defect in the plaintiff's argument. "Sound value", the plaintiff states "means replacement cost less observed depreciation." No case is cited which so holds. Plaintiff's counsel have conceded in answer to the court's inquiry that no Wisconsin case adopts this definition. We must construe their failure to cite any case in any jurisdiction defining "sound value" as they wish it defined here as a tacit admission that no legal authority exists for their position. This lack of precedent disturbs the plaintiff not a whit, however, for it contends that the facts of this case conclusively establish its proposition. The facts upon which it relies are the testimony of Elmer Trost, Frank Riedl and Clement J. Schwingle, Exhibit 162, and "judicial admissions" by counsel for the defendant insurer.

The testimony of Trost and Riedl, together with Exhibit 162, are pointed to by the plaintiff as proof that the policies of insurance were sold by the defendant insurer and purchased by the plaintiff with the express understanding that indemnification in the event of loss by fire would be made on the basis of "sound value". Mr. Trost, manager of the F. I. A. office in Milwaukee, and Mr. Riedl, manager of the Fire Insurance Department of Chris. Schroeder & Son, Inc., the agent that sold the policies in question to the plaintiff, both testified that the policies involved herein were sold to the plaintiff on the basis of "sound value", defining that term as "replacement cost less depreciation". Exhibit No. 162, quoted in full earlier in this opinion, establishes the same fact, that the policies were sold on the basis of "replacement cost less depreciation". It must be pointed out that neither Mr. Trost, nor Mr. Riedl, nor Exhibit 162, defines "sound value" in the manner contended for by the plaintiff. The testimony of the two witnesses, and the language of the exhibit prove conclusively that the policies were sold with the understanding that indemnification would be on the

basis of "replacement cost less depreciation." Nowhere is this limited to "observed" depreciation, despite the many positive assertions made by the plaintiff in the presentation of its case, so as to bar consideration of those factors which the case law indicates are relevant.

During the course of the trial, Clement J. Schwingle, President of the American Appraisal Company, appeared as a witness at his own request * * * "so that we could state correctly our company's position in these matters and practices in these matters."

During the course of his testimony, Mr. Schwingle stated that while "replacement cost less observed depreciation" was a proper method of computing sound value, the phrase "observed depreciation" was not limited, as Zahn believed, to what the eye could see. In his opinion, all factors were to be considered in determining sound value, including market value and obsolescence. While he subscribed to the definition of sound value contained in Exhibit 167, his testimony is very clear that under all the circumstances here present other factors, including market value and obsolescence, should be considered.

We have carefully reviewed those portions of the transcript cited to us by the plaintiff as containing "judicial admissions" by counsel for the defendant insurer, and find no instance where the defendant insurer can be said to have admitted the validity of the plaintiff's position. While counsel for the defendant insurer has "admitted" often that "actual cash value" and "sound value" are synonymous and even that sound value may sometimes be ascertained by depreciating the replacement cost new, he has never abandoned, but has consistently urged his position, that the court must take into consideration all of the facts and circumstances which would logically tend to the formation of a correct estimate of the loss.

While the value of each item destroyed or damaged by the fire of April 28, 1957 and the consequent loss to those items may be questions of fact, the law determines what factors should be considered in arriving at that value. Since our jurisdiction in this case is based on diversity of citizenship, the law applicable is the law of Wisconsin, where the policies in suit were issued. No case has been cited by the parties nor found by the court wherein the Supreme Court of Wisconsin has been called upon to discuss the factors relevant in determining "actual cash value". An examination of the two Wisconsin Supreme Court cases cited wherein the "actual cash value" of property was in question, however, one involving an automobile insurance policy and the other involving standard fire insurance policies, reveals that that court has approved consideration of a wide variety of factors in ascertaining such value and has not limited the trier of facts to consideration of "replacement cost less observed depreciation" alone.

In the case of Engh v. Calvert Fire Insurance Company, 1954, 266 Wis. 419, 63 N.W.2d 831, involving a collision loss under an automobile insurance policy which limited the insurer's liability to the "actual cash value" of the insured truck, the Wisconsin Supreme Court, after stating that in an action for damages brought upon a contract of insurance, the provisions of the contract govern the measure of damages, stated (266 Wis. at pages 425–426, 63 N.W.2d at page 834):

"The measure of liability in this type of situation is the difference between the value of the property immediately before the loss and its value immediately afterwards. The defendant contends that there is no competent proof in the record to establish the market value either before or after the loss. With this position we cannot agree. The defendant at the trial offered proof regarding such values. The adjuster, Doherty, as an expert, presented several bases of value of the tractor both before and after the collision. Probably the defendant now finds it-

self disappointed that the trial court did not adopt a measure more favorable to the defendant. *However, it was within the province of the trial court to adopt any of the measures which the defendant offered,—all of such being competent."* (Emphasis ours.)

The measures offered by the defendant and defined as competent by the Supreme Court, found in the testimony of the defendant's adjuster, were replacement cost less depreciation for age, (which measure was adopted by the trial court,) and replacement cost less depreciation for use.[8] The trial court also received evidence without criticism by the Supreme Court of the original cost to the plaintiff of the insured truck (including financing charges and insurance premiums), the purpose for which the truck was used, the cost of a new truck, the cost of repairing the truck, the amount of use to which the truck had been put, and the salvage value of the truck.

In Cassel v. Newark Insurance Company, 1956, 274 Wis. 25, 79 N.W.2d 101, an action by the insureds to recover for water damage to the contents of their business establishment under the extended coverage endorsements attached to fire insurance policies issued by the defendants, a question arose as to whether the trial court had properly instructed the jury as to the method of ascertaining "actual cash value". The Supreme Court approved an instruction to the effect that the proper measure of damages was the difference between the fair market value of the plaintiff's property before and after the damage. No problem of depreciation existed.

We are satisfied that the Supreme Court of Wisconsin has not, thus far, announced any invariable tests to be applied by the trier of the facts in ascertaining the actual cash value of insured property which has been destroyed or damaged by fire. If it were called upon

to prescribe such a test it would find itself facing the same problem as did the New Hampshire Supreme Court in 1956, when it decided the case of Pinet v. New Hampshire Fire Insurance Company, 100 N.H. 346, 126 A.2d 262, 61 A.L.R.2d 706, and for the first time had occasion to commit itself to the proper test to be used in determining the actual cash value of the insured's property. Because the problem facing the New Hampshire Supreme Court was similar to the problem now before us, we shall quote at length from its opinion (100 N.H. 346, 126 A. 2d 264, pages 710–711 of 61 A.L.R.2d):

"The 'actual cash value' clause in the insurance policy does not establish any rule for determining the amount of loss but simply imposes a limitation upon the amount which may be recovered. McAnarney v. Newark Fire Insurance Co., 247 N.Y. 176, 159 N.E. 902, 56 A.L.R. 1149. Likewise the further provision that liability shall not exceed the cost of replacement is a limitation of the insurer's liability and not a substantive measure of damages which the insured may invoke. Citizens' [Sav.] Bank [& Trust Co.] v. Fitchburg Fire Ins. Co., 86 Vt. 267, 84 A. 970; Voges v. Mechanics Ins. Co., 119 Neb. 553, 230 N.W. 105. It is not surprising, therefore, to find that some courts construing a valuation condition similar to the one in the instant case used fair market value as the test; other courts, with greater emphasis on the language of the valuation clause, use the cost of replacement as the test to measure the amount of the insured's loss. Anno[tation] 56 A.L.R. 1155. 'In conclusion, it may be stated that the courts, with practical unanimity, have shown a marked disinclination to do more than simply apply or reject, as a measure of " 'actual cash value' " of the particular property insured, under the circumstances of

8. In the instant case, plaintiff's experts failed almost without exception to consider age, and no testimony as to the amount of use sustained by any of the plaintiff's property was offered.

the individual case, one or the other of the two general tests, namely, either the market-value test or the test of replacement value.' 7 Couch, Cyc. Ins. Law, § 1840, p. 6134.

"In this state the court has had no occasion to commit itself to either the fair-market-value test or the test of replacement cost in determining the actual cash value of the insured's property. See Huckins v. Peoples' Mut. Fire Ins. Co., 31 N.H. 238; Wood v. [Manufacturers & Merchants Mut.] Insurance Co., 89 N.H. 213, 195 A. 667. However, we are impressed with what might be denominated a third rule which has received support in New York, Massachusetts and South Dakota, McAnarney v. Newark Fire Insurance Co., 247 N.Y. 176, 159 N.E. 902, 56 A.L.R. 1149; Kingsley v. Spofford, 298 Mass. 469, 11 N.E.2d 487; Lampe Market Co. v. Alliance Ins. Co., 71 S.D. 120, 22 N.W.2d 427. In these jurisdictions neither market value nor replacement cost is an exclusive test. Evidence of both market value and replacement cost with depreciation may be introduced as evidence of actual cash value. These jurisdictions stress the fact that variations in the types of property and the conditions under which they are destroyed prevent the adoption of any single test for all cases. The objective in these cases is to see that the insured should incur neither economic gain nor loss if he is adequately insured and suffers partial fire loss. See Howland, Depreciation and Partial Losses, Proc. A.B.A., Section of Insurance Law, pp. 90, 95 (1953).

"In adopting this third rule in this state, which has worked successfully elsewhere, we are fortified by the authoritative conclusions of Bonbright and Katz, Valuation of Property to Measure Fire Insurance Losses, 29 Col.L.Rev. 857, 899. 'In general we conclude that the opinion of the courts, especially of the appellate courts, have shown an increasing desire to make the measure of recovery for fire insurance losses correspond to the actual loss sustained by the insured in view of all the circumstances of the case. To put the matter in other words, the courts, when faced with a choice between applying some standardized rigid rule such as replacement cost minus physical depreciation or of adopting some more flexible test which can be modified in such a way as to accord more nearly with the principle of indemnity, have generally preferred the latter alternative even though it has involved the sacrifice of administrative convenience and of simplicity.' See also, I Bonbright, Valuation of Property, 406.

"In the last analysis the 'actual cash value' of the plaintiff's loss must be expressed in terms of money which is a matter of opinion. The trier of fact in determining that question may receive evidence whether there is a fair market value or replacement cost and in either case what it may be. Both fair market value and replacement cost are permissible standards for determining fire losses but they are standards and not shackles."

The case of McAnarney v. Newark Fire Insurance Company, 1928, 247 N.Y. 176, 159 N.E. 902, 56 A.L.R. 1149, cited in the Pinet case, is the leading case adopting what has been referred to as the "broad evidence rule". In that case, the New York Court of Appeals, in commenting on the type of evidence admissible to prove the actual cash value of insured obsolete buildings which had been destroyed by fire, stated (247 N.Y. 176, 159 N.E. 905, page 1154 of 56 A.L.R.):

"Where insured buildings have been destroyed, the trier of fact may, and should, call to its aid, in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of the loss.' It may consider original

cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may have been made by the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light upon the subject."

Although in the McAnarney case, the court was concerned only with the value of obsolete buildings, the above quoted principle enunciated therein, the "broad evidence rule", has been applied in numerous other cases to evaluate a wide variety of property. In the Pinet case, the court ruled it applicable to determine the value of chinchillas; in the case of Thorp v. American Aviation and General Insurance Company, 3 Cir., 1954, 212 F.2d 821, the court refused to criticize instructions to the jury by the lower court adopting the principle set forth in the McAnarney case as the proper method of determining the actual cash value of a moving picture theatre, projection booth and furniture, fixtures and equipment; In Nebraska Drillers, Inc. v. Westchester Fire Ins. Co. of New York, D.C.D.Colo.1954, 123 F.Supp. 678, the principle was applied to determine the value of supplies and equipment of the plaintiff; in Travelers Indemnity Co. v. Plymouth Box & Panel Co., 4 Cir., 1938, 99 F.2d 218, it was applied to determine the value of a steam turbine.[9]

We have examined carefully the only two Wisconsin cases mentioned above, which have been cited dealing with the question of the "actual cash value" of insured property, and all of the cases from other jurisdictions which the parties have called to our attention dealing with the factors which may be considered in determining actual cash value, and have come to the conclusion

that the Supreme Court of Wisconsin, were it called upon to define those factors for the first time, would, as did the Supreme Court of New Hampshire in the Pinet case, note that the recent opinions of the courts, especially of the appellate courts have adopted the "broad evidence rule" of the McAnarney case as the method most likely to effectuate indemnity. We have therefore considered the evidence of the plaintiff's expert witnesses as to what they referred to as the "sound value" of the insured property, and the expert testimony adduced by the defendant insurer as to the market value of that property. For the reasons heretofore stated we have not considered the testimony of Mr. Krogstad regarding Mr. Weisman's negotiations for sale of the plaintiff's assets. Neither have we considered the testimony offered by the defendant as to the cost of acquisition of plaintiff's stock by Mr. Pruscha and Mr. Susnar in 1946, nor as to the 1950 offer for sale of the plaintiff's stock by those two men. We do not consider this evidence as to the value of stock relevant on the question of value of assets in the absence of other relevant facts which would show the condition of the company at those times.

We have considered in this case a wide variety of factors before reaching our conclusion with respect to the amount of the plaintiff's loss. We have noted that the parties are agreed that the plaintiff's experts have properly listed the machinery, and have for the most part correctly set forth the replacement value new thereof.[10] We have considered the listed replacement values realizing that in some instances they truly represent the cost of new machines while with respect to many machines, they are merely estimates since the manufacture of these machines has been discontinued and new

9. For a discussion of the "broad evidence rule" and other tests or criteria of "actual cash value" see Annotation 61 A.L.R. 2d 711. "Test or criterion of 'actual cash value' under insurance policy insuring to extent of actual cash value at time of loss."

10. The replacement values set forth by the plaintiff in its proofs of loss have been corrected slightly, notably with respect to the Gridley Model G automatic screw machines.

machines will never be available. We have considered the estimates by the plaintiff's experts of the "sound value" of each machine and noted that in depreciating the replacement value to arrive at sound value as of the time of the fire the plaintiff's experts considered only "what the eye can see", that is, condition and maintenance,[11] and did not consider age, obsolescence,[12] the manner in which the plaintiff acquired its machinery, or the used machinery market. We have considered the age of the machinery, finding that as to those machines the age of which has been stated it appears that the majority fall into two categories, those manufactured prior to 1930 and those manufactured between 1940 and 1944. We have considered the fact that the plaintiff's machinery was well maintained and in generally good condition, but that much of it had been superseded by more modern machinery. We have also considered the fact that the plaintiff acquired most of its machinery on the used machinery market, and have examined the testimony of Mr. Richards and Mr. Thomas P. Scanlan as to the nature of that market, realizing that it has not been demonstrated that machinery duplicating in all respects that of the plaintiff is available on the market but that comparable machinery is available. We have considered the testimony of Mr. Richards both as to the market value of the plaintiff's machines and as to the price for which comparable machines could have been obtained on the market within a reasonable time after the fire,[13] and have noted that he is the only expert who had examined the property in an undamaged state.

After considering these and all other relevant factors, we have arrived at the conclusion that the amount of $316,982.-50 would completely indemnify the plaintiff for the loss sustained to its machinery as a result of the fire of April 28, 1957. This amount is the figure submitted by Mr. Richards, as adjusted by Edwin I. Peters, executive general adjuster for Western Adjustment and Inspection Company, who worked with the defendant insurer on the loss involved herein.[14] It is our belief that this amount is the end result of a consideration of all factors relevant in estimating the loss.

In ascertaining the amount of loss sustained by the plaintiff to its tooling we have also considered a variety of factors. Here, too, we have noted that the parties are agreed that the plaintiff's experts have for the most part accurately listed the items of tooling on the plaintiff's premises at the time of the fire and the replacement value thereof. We have considered the sound values listed by the plaintiff's experts, and the manner in which these sound values were arrived at. It appears that in establishing a rate of depreciation to apply to the replacement value of tooling in order to arrive at sound value, the plaintiff's experts considered physical condition and what they

11. No evidence as to the cost to the plaintiff of maintaining its machinery was adduced, apparently because, under its theory of case, the plaintiff considered such evidence immaterial and because it was unable to furnish the defendant insurer with information regarding such cost due to the destruction of its records in the fire.

12. It was Mr. Zahn's belief that his manner of trending up the last selling price of discontinued machines to determine the present replacement cost thereof reflected obsolescence. This belief is based upon the unsupported assumptions that the price of the superseding machine in-

evitably exceeds that of the discontinued machine and that the difference in price always reflects considerations of obsolescence.

13. With respect to admissibility of opinions of experts as to the market value of insured property see Home Ins. Co. of New York v. Tydal Co., 5 Cir., 1946, 152 F.2d 309, rehearing denied 5 Cir., 157 F.2d 851.

14. Mr. Peters corrected several relatively minor errors in the Richards appraisal and added thereto cost of freight and installation of machinery and of cleaning and preserving partially damaged machines.

referred to as future utility, expectancy of useful life and the amount of physical use which had been expended, and did not consider the manner in which the plaintiff acquired its tooling, whether a certain complement of tooling is offered with the machines when bought or sold, its age, obsolescence, or when the tooling was last used or would be used again. We have considered Mr. Richards' testimony that his appraisal figures with respect to the plaintiff's automatic screw machines included normal complements of non-perishable tooling. We have considered Mr. McLean's testimony with respect to various methods of computing the value of tooling based on the value of machines, realizing that these methods would compensate the plaintiff not for the tooling it actually had on its premises, but for an amount of tooling which it would be normal for it to have. We have also considered Mr. McLean's summary of the plaintiff's tooling schedule showing that there was a definite relationship between the amount of tooling and the age of the plaintiff's machinery, that is, that the older a machine was, the more tooling had been accumulated for use on that machine.

After re-examining all of the evidence relating to the value of and loss to the plaintiff's tooling, we have concluded that neither party's appraisal of tooling accurately depicts the actual cash value thereof at the time of the fire and the loss thereto by reason of the fire. We do not believe, however, that the plaintiff should be barred from recovery by reason of the uncertainty of proof. As was stated in Nebraska Drillers, Inc. v. Westchester Fire Ins. Co. of New York, supra, 123 F.Supp. at page 682:

> "The Court does not believe that uncertainty in the proof or the fact that the position of either party cannot be accepted in its entirety, works the result that no judgment, one way or the other, can be arrived at, or that the plaintiff, entitled to something, must be turned away empty handed. Difficulty of proof does not destroy the right of recovery, providing that the amount of the award is not based on mere surmise and conjecture. As indicated above, the fact finder can look to various circumstances in evidence to weigh the strength of the respective positions and the degree to which either should be accepted or rejected by the Court."

In its two schedules of tooling, concededly a substantially correct listing of its tooling at the time of the fire, the plaintiff has set forth in some 237 pages, thousands of machine parts, perishable tools and non-perishable tools. In its schedule introduced in evidence as Exhibit 109–B it has listed in 168 pages that tooling which was for the most part totally destroyed by the fire. In the second schedule, Exhibit 109–E, it has listed that tooling which was only partially damaged and for which the only loss claimed is the cost of salvaging.

The defendant insurer has agreed that the plaintiff has properly computed the cost of salvaging tooling set forth in Exhibit 109–E.[15] It has also agreed that the plaintiff has correctly computed the replacement and sound values of, and loss to, tooling scheduled as the property of Blackhawk Manufacturing Company and tooling which was new at the time of the fire. We believe that the plaintiff is entitled to recover the full amount claimed as loss as to those items concerning which agreement on amount has been reached.

We have been furnished in Exhibit 109–B with the correct replacement cost new of the balance of the tooling. We direct the defendant insurer, which we will order to prepare findings of fact and conclusions of law, to arrive at a figure which in our opinion will be the actual cash value thereof in the following manner:

15. The defendant insurer has not agreed that the plaintiff has correctly estimated the sound value of the tooling listed in that schedule, but does not quarrel with the loss figure listed.

(1) Determine from the plaintiff's machinery schedule the overall average rate of depreciation taken by the plaintiff's experts in arriving at the total sound value of machines.

(2) Using the figures submitted by the plaintiff's experts as the replacement value of machinery, and the figure submitted by Richards as to the actual value thereof at the time of the fire, determine the average rate of depreciation which would result in the value arrived at by Richards.

(3) Determine from the plaintiff's tooling schedule, 109–B, the average rate of depreciation taken by the plaintiff's experts in arriving at the total sound value of that tooling.

(4) Increase the plaintiff's average rate of depreciation on tooling by the difference between (1) and (2) and apply that rate of depreciation to the total replacement value of the tooling listed in Exhibit 109–B.

We believe that the use of the above formula will enable the defendant insurer to arrive at a correct estimate of the actual cash value of the plaintiff's tooling for the following reason: We have previously determined that Richards has correctly set forth the actual cash value of the plaintiff's machinery. Since the plaintiff, through the use of its method of depreciation arrived at a much higher figure as its estimate of sound value, it follows that the plaintiff's method resulted in an under-depreciation of the machinery. This same method was used by the plaintiff with respect to tooling and in our opinion resulted in a comparable under-depreciation. By so adjusting the rate of depreciation, a proper estimate of the actual cash value of the tooling listed in Exhibit 109–B can be arrived at. As we have stated before, most of the items listed in Exhibit 109–B were wholly destroyed; therefore, the plaintiff is entitled to recover the actual cash value thereof as determined in the manner set forth above. As to those items which were partially destroyed, listed at Page 165 of Exhibit 109–B, the above formula will be applied to determine actual cash value. Since the defendant did not contest the estimate of plaintiff's experts that those items were approximately 50% destroyed, the plaintiff's loss and the amount which it is entitled to recover, is 50% of the actual cash value so arrived at.

In its machinery schedule, the plaintiff has included its estimation of the replacement value of, sound value of and loss to lubricating and cutting oil, power wiring, manufacturing piping, factory and office furniture and fixtures, and certain property owned by Wisconsin Electric Power Company.

In respect of lubricating and cutting oil, the parties are agreed that the amount listed by the plaintiff as replacement value, sound value and loss are correct. We therefore hold that the plaintiff is entitled to the amount listed, $1,658.-54.

In arriving at the sound value of manufacturing piping, factory furniture and fixtures and office furniture and fixtures, the plaintiff's experts used the same method of depreciation as they used with respect to machinery and tooling, arriving at a depreciation rate of 30%. The defendant insurer has conceded that the plaintiff correctly listed the replacement value new thereof, but its proofs result in an estimation of 50% depreciation. In view of the defendant's position in this respect we believe it unnecessary to direct the application of the formula heretofore set out with respect to tooling. The plaintiff is therefore entitled to recover $4,062.30 for loss sustained to its manufacturing piping, $9,736.13 less salvage value of $1,000 for loss sustained to its factory furniture and fixtures, and $13,443.12 for loss sustained to its office furniture and fixtures.

This same depreciation rate of 50%, we believe, should be applied to the plaintiff's estimate of the replacement value of power wiring listed in its machinery schedule in order to arrive at the actual cash value thereof. Since the power wiring was totally destroyed the plaintiff is

entitled to recover the entire actual cash value so found, being $22,721.50.[16]

With its machinery schedule the plaintiff has included a claim for loss to property of the Wisconsin Electric Power Company by reason of the fire. A letter from that company listing that property and its value, informing the plaintiff that it was responsible for the property, and requesting the plaintiff to file a claim for loss thereto with its insurer, was attached to the schedule. We find no proof of either coverage, loss or the amount of loss, nor is there any concession of coverage and loss as there is in respect of the property of the Blackhawk Manufacturing Company. In the absence of such proof we must find that the plaintiff has not shown its entitlement to recover the amount claimed as loss to Wisconsin Electric Power Company property.

In its schedule introduced in evidence as Exhibit 109–D, the plaintiff has made claim for loss to its stock, steel, aluminum, brass, and office supplies, and to personal property of employees. It has also made a claim for cost of transcribing records. No problem of depreciation exists with respect to any of the items in that schedule except the personal property of employees.

We believe that the plaintiff's expert, Mr. Wick, has properly determined the value of finished and semi-finished parts, which were totally destroyed, by listing the plaintiff's cost as value. We also believe Mr. Wick correctly determined the cost of salvaging parts not wholly destroyed by the fire and the loss to the plaintiff's steel, aluminum and brass. However, in respect to these items, it is our opinion that the plaintiff should have deducted salvage value from the amount of loss claimed to "wholly destroyed" items in the amount of $1,100.

On office supplies, the plaintiff submitted an inventory based on the memory of office help, which resulted in a claim for loss of $6,650.55. In the absence of records, the defendant insurer went to the suppliers and obtained a history of plaintiff's purchasing for the past three years which showed the following expenditures: 1954–$5,650; 1955–$4,708; 1956–$3,879; first five months of 1957–$720.41. In the light of the history which shows declining yearly purchases and at best an average of $4,745 for the preceding three years, the defendant's estimate of loss in this respect, being $4,433.70, seems very equitable.

The plaintiff's estimate of the cost of transcribing records has not been disputed.

On behalf of the employees the plaintiff has submitted claims of its workmen showing a replacement value of their property lost in the fire of $7,945.31, and a sound value of $5,966.74. The property was wholly destroyed. The average rate of depreciation taken was approximately 25%. The defendant contends that it should be increased to 50%.

We are here dealing with a claim in behalf of thirty-five individual workmen. The testimony in this respect shows the various employees were called in and depreciation was discussed with them together with the foremen and set-up men, after replacement values had been obtained from catalogues, suppliers and various other places. As against this, we have only the statement of defendant's adjuster that in cases of this type it has been his experience that depreciation of 50% is fair. We are unable to hold that the depreciation is any greater than shown in the schedule.

 The only question of damages remaining is that of the amount of loss sustained by the plaintiff to its building and fixtures as a result of the fire. Considering the protracted nature of this trial a surprisingly little amount of testimony was devoted to this major element of damages. As we have stated, the insured building consisted of one main

16. The defendant insurer has suggested a 50% depreciation rate for a portion of the wiring, and has included the remainder in its estimate of the value of and loss to the plaintiff's building.

building, being a two-story structure, and the additions thereto. Although it is treated in the proofs of loss as six buildings and designated in the policies as four buildings, it is clear that the structure is in reality one building with a number of additions and sheds.

Little information was furnished during the trial concerning the background of the building. It appears, however, from the testimony of Mr. Peters, that the main two-story brick building was built in the late 1890's as a harness hardware concern, and was taken over by the plaintiff in 1919 and adapted to the plaintiff's operations by bolstering the floors for second floor operations and making additions and modifications to suit its occupancy. Based on his experience, Mr. Peters believed a depreciation of 1% a year proper on the building. The age of the additions was not estimated, with the exception of the "West building", which Mr. Timlin believed to be between fifteen and twenty years old. It further appears from the testimony of Mr. Pruscha that the shipping room was enlarged in about 1950, and from the testimony of William Hetzel, an electrical contractor, who estimated the cost of replacing wiring, that the wiring was approximately fifteen years old. The building appears to have been in adequate condition for the purposes of the plaintiff corporation.

In the absence of such specific information, the court will assume that the additions were less old than the main sixty-year-old building, but their utility was so dependent upon the main building that under the circumstances of the proofs as we have them, we believe that it would be fair and reasonable to treat the entire structure as having an age of fifty years.

Neither of the parties have furnished us with an estimate of the actual cash value of the insured building at the time of the loss. The plaintiff has submitted an estimate of loss based on the cost of

repairing partially destroyed sections of the building, and the depreciated cost of reconstructing wholly destroyed sections.[17] The defendant insurer has estimated the cost of repairing the entire building, which estimate too contemplates complete reconstruction of wholly destroyed sections. It appears that the main building, west building (maintenance department), and north building were totally destroyed and the inspection, tool and cleaning room building, southwest building (shipping room), and grinding room were salvageable. The defendant insurer has also estimated the cost of rebuilding completely, using for the most part existing footings and floor slabs, to be $327,015.69 (Exhibit 182). This estimate included, however, a figure for replacement of power wiring, which we have previously considered in connection with the plaintiff's machinery schedule.

It is our opinion that the actual cash value of the entire building, except footings and floor slabs, at the time of the fire, can be estimated by subtracting from the defendant's estimate of the cost of rebuilding completely the cost of repairs to floor slabs, depreciating the remainder by 50% and subtracting from such depreciated figure the amount of $9,443.50, heretofore allowed to the plaintiff for loss to the power wiring included by the defendant in this estimate. After considering the evidence relating to the building, it is our opinion that a depreciation rate of 50% is reasonable.

The actual cash value of the building, exclusive of floor slabs and footings, arrived at in the manner described above, is the maximum amount which the plaintiff is entitled to recover for loss to that building. Although the cost of repairs, as estimated by both parties, greatly exceeds that actual cash value, the terms of the policies here involved limit recovery to the actual cash value of the insured property.

17. What the plaintiff's schedule (Exhibit 109–A) sets forth as replacement value and sound value does not, in reality, reflect the cost of complete reconstruction and the depreciated cost thereof.

Since the floor slabs were only partially destroyed, and it does not appear that the cost of their repair exceeds their actual cash value, the plaintiff is entitled to recover the entire cost of their repair as shown in Exhibit 181.

■ Under ordinary circumstances, we believe that the proper measure of damages to be employed when an insured building has been partially destroyed is the cost of repairs thereto, not to exceed actual cash value of the *entire* building. The proofs in this case did not permit the application of that formula, since we did not have sufficient information with which to arrive at an estimate of the actual cash value of the entire building. For that reason, we considered the floor slabs separately.

### Affirmative Defense of Fraud.

There remains for consideration by this court only the second affirmative defense interposed by the defendant * * *.

Prior to the trial, the defendant insurer stipulated that that affirmative defense was limited to fraud residing in the statements contained in the plaintiff's proofs of loss concerning the value of and loss to the items insured and damaged or destroyed by the fire. It further stipulated that it did not claim that the plaintiff had fraudulently or falsely listed items in its proof of loss which were not damaged or destroyed nor does the defendant dispute the replacement values as set out in the plaintiff's schedules.

During the course of the trial, the court granted the motion of the plaintiff to strike this defense, stating that in view of the facts stipulated, the only area in which fraud might have resided was in the use by plaintiff's public adjusting firm, Strauss-Zahn, of a formula limited to replacement value less observed depreciation and hence excluding considerations of obsolescence and market conditions. At the conclusion of the trial, however, when the matter of briefing was being discussed, the court granted the defendant leave to submit a brief for reconsideration of the court's ruling granting the motion to strike this affirmative defense.

We have heretofore set out our conclusions from the applicable law as to the factors to be considered in determining the actual cash value of the insured property. We have made either specific findings of value or arrived at the formula by which the exact computations can be made. While the exact amount cannot be determined until the compilations are made, we believe that for the purposes of this motion we can assume that the total amount of damages will approximate $800,000. This second affirmative defense is of course of critical importance to the defendant, and in view of the disparity between the damages as found by the court and the loss claimed by the plaintiff of $1,474.906.38, we believe that it is entitled to the benefit of the court's views.

The defendant insurer advances the following facts as proof that the plaintiff, through its officer, agent and employee, Mr. Susnar, submitted proofs of loss to the defendant in which it knowingly, falsely and fraudulently swore that the actual cash value of the insured property was $1,658,371.14, when that value in fact, the defendant claims, was less than $900,000, and that the loss thereto was in the amount of $1,474,906.38, whereas in truth and in fact, it claims, the entire loss was less than $800,000:

1. The stock of the plaintiff corporation was purchased in 1946 by the present owners of all of its outstanding stock, Pruscha and Susnar and two others, for a total price of $325,000.

2. Pruscha and Susnar authorized Harry M. Hintz to sell the stock of the plaintiff for $550,000 in July, 1950.

3. In 1953, the plaintiff's machinery, which it now claims has an actual cash value of $714,342.37, was appraised by the L. L. Richards Machinery Company at $495,405.00, which appraisal was

known to the plaintiff's officers and owners.[18]

4. In 1955, the Richards Company made a second appraisal of the plaintiff's machinery, also known to the plaintiff's officers and owners, estimating the value thereof to be $360,505.

5. Shortly before the fire, in March, 1957, Mr. Weisman, the plaintiff's attorney, negotiated with Mr. Krogstad for a sale of all of the plaintiff's property, including the land and other property not insured under the policies herein involved, for the price of $675,000.

Had the defendant developed these points to show that these were the actual values of the assets and established that the plaintiff is chargeable with knowledge thereof, the defendant would have a formidable basis for its affirmative defense. We have heretofore commented at greater length on these various points, but for the purposes of convenience, we will again allude to them. It is undenied that Pruscha and Susnar and two others acquired the stock in 1946 for $325,000, but we are unable in the absence of additional facts showing the financial condition of the company, to arrive at a valuation of the physical assets at that somewhat remote date. The same is true as to the authorization to Hintz to sell the stock of the plaintiff for $550,000 in 1950. The negotiations between Mr. Weisman and Mr. Krogstad have heretofore been held inadmissible for want of a showing of authorization to negotiate on the part of Weisman. That would leave only the two appraisals by the Richards Machinery Company in 1953 and in 1955. As against that we have the fact that the figures submitted by the plaintiff in its proofs of loss were arrived at not by the owners of the plaintiff, but by Timlin, Wick and Zahn, independent adjusters, by the use of the formula of replacement value new less observable depreciation. While it is true that the amount of compensation of Strauss-Zahn Company, the employer of Timlin and Wick, was dependent upon the amount of the plaintiff's recovery, we cannot find that Timlin and Wick evinced a lack of good faith in the use of their formula.

We have given careful study to the evidence in respect to this defense of fraud in preparing this decision. In so doing, we have had in mind the holding of our own Seventh Circuit Court of Appeals in the case of Tenore v. American & Foreign Insurance Company of New York, 1958, 256 F.2d 791, certiorari denied 358 U.S. 880, 79 S.Ct. 119, 3 L. Ed.2d 110. In the opinion of this court, the admissible evidence is insufficient to satisfy the defendant's burden of proving fraud by clear and convincing proof.

On December 10, 1959, pursuant to stipulation of the plaintiff, the defendant insurer, and Chris. Schroeder & Son, Inc., judgment was entered in favor of Chris. Schroeder & Son, Inc., mortgagee and insured under a standard mortgage clause which was a part of each policy involved herein, and against Fireman's Fund Insurance Company, in the amount of $84,594.22, which judgment has been satisfied. The defendant insurer is entitled to offset and deduct this amount against the amount which the plaintiff recovers.

While we have rejected the defendant insurer's two affirmative defenses, the results in respect to damages, and the methods by which they should be computed are more consonant with the defendant's position in this case. We therefore direct the defendant insurer to prepare findings of fact and conclusions of law in conformity with this opinion and submit them to opposing counsel for approval as to form. The findings should reflect the interest of the Civic Finance Corp. of Wisconsin in these proceedings.

Opinion with Respect to Interest.

On October 19, 1960, an opinion was filed by this court in the above captioned case in which the plaintiff, Wisconsin

18. Although some changes in machinery were made between 1953 and the date of the fire, the 1953 Richards appraisal and the plaintiff's schedule list substantially the same machines.

Screw Company, sought to recover $1,-284,646.27 on three fire insurance policies issued by the defendant, Fireman's Fund Insurance Company. In that opinion, the court held that the affirmative defenses of increase of hazard and fraud raised by the defendant insurer had not been proved, and that the plaintiff was entitled to recover in an amount to be computed in a manner prescribed by the court. The amount of loss found by the court to have been sustained by the plaintiff as a result of a fire occurring on its premises on April 28, 1957, approximates $800,000, in contrast to a $1,474,906.38 loss claimed by the plaintiff in its proofs of loss and throughout this lawsuit.[1]

In the final paragraph of that opinion, the court noted that the results arrived at in respect to damages were more consonant with the position of the defendant insurer, and directed its counsel to prepare findings of fact and conclusions of law and submit them to opposing counsel for approval as to form. Proposed findings and conclusions were forwarded to the court in compliance with this direction on October 31, 1960, and copies thereof were submitted to counsel for the plaintiff.

On November 16, 1960, counsel for the plaintiff notified the court by letter that they objected to the form and content of the proposed findings and conclusions. However, only one specific objection was made, and that was directed not to any of the proposed findings and conclusions, but to the absence of a provision for payment of interest from the date of the fire. Since the parties had not discussed the question of allowability of interest in their briefs filed prior to the filing of the ·opinion, and since the amount involved is substantial, the court afforded them such an opportunity. Those briefs have now been filed and considered by the court.

While the parties are agreed that the question of liability for interest is gov-

erned by the law of Wisconsin, neither has submitted any authority on the precise issue here presented. The plaintiff on its part relies on § 115.04, Wisconsin Statutes, and the following decisions of the Wisconsin Supreme Court: Miller v. Tainter, 1948, 252 Wis. 266, 31 N.W. 2d 531; Georgiades v. Glickman, 1956, 272 Wis. 257, 75 N.W.2d 573; Engh v. Calvert Fire Insurance Company, 1954, 266 Wis. 419, 63 N.W.2d 831, and Olson v. Herman Farmers' Mutual Insurance Company, 1925, 187 Wis. 15, 203 N.W. 743.

A reading of § 115.04, Wisconsin Statutes, establishes for our purposes nothing but that the legal rate of interest in Wisconsin is 5%:

"115.04 Interest rates. The rate of interest upon the loan or forebearance of any money, goods or things in action shall be $5 upon the $100 for one year and according to that rate for a greater or less sum or for a longer or a shorter time; but parties may contract for the payment and receipt of a rate of interest not exceeding $10 on $100 as aforesaid, in which case such rate exceeding $5 on $100 shall be clearly expressed in writing."

We must therefore look to the case law to determine under what circumstances the prevailing party is entitled to interest prior to judgment. In this respect we will first discuss the four cases relied upon by the plaintiff.

The case of Miller v. Tainter, supra, cited by the plaintiff, narrows the application of the interest statute with its holding that § 115.04 applies only to contract liabilities and liabilites reduced to judgment.

The case of Georgiades v. Glickman, supra, illustrates the application of the legal rate of interest to contract obligations. This case involved an action un-

---

1. Plaintiff contends that the actual cash value of the insured property at the time of the loss was $1,658,371.14. The policies in suit afforded a total coverage of $1,300,000, and each contained a 90% co-insurance clause. On the basis of its own appraisals, plaintiff admitted to being under-insured, and although alleging a loss of $1,474,906.38, agreed that its recovery should not exceed $1,284,646.27.

der an employment contract between the plaintiff, an employee, and a partnership operating outdoor theatres, whereby the employee was to receive as part of his compensation a percentage of the net income from operations of the theatres for a period of three years. The contract provided a formula for the determination of the net income from operations, the interpretation of which was strongly disputed by the parties. With respect to allowance of interest, the Supreme Court of Wisconsin stated as follows (272 Wis. at pages 273–274, 75 N.W.2d at page 581):

> "The contract of employment expressly provided that the additional compensation due plaintiff based upon a share of the partnership net income 'shall be due and payable not later than seventy-five (75) days after the close of the fiscal year during which such income is earned.' The trial court awarded the plaintiff interest on the amount of such additional compensation found due for each of the three fiscal years in question computed from the seventy-fifth day subsequent to the ending of the fiscal year. We consider that this was proper and in accord with the rule that this court laid down in State v. City of Milwaukee, 1914, 158 Wis. 564, 574, 149 N.W. 579, 583, as follows:
>
> "'* * * where the time of payment is fixed by contract or by law and the amount to be paid is easily ascertainable and the duty to pay plain, no demand is necessary to start the running of interest, whether the claim be against an individual or a municipality.'
>
> "The following statement in 47 C.J.S. Interest § 8a, p. 21, is in accord:
>
> "'It has been held in a number of cases that, where a definite contract exists for the payment of money at a fixed date, and there is a breach of such contract, the law raises an implied promise to pay interest on the sum due; an implication created, it has been said, because in such cases justice to the creditor cannot be done without it.'"

In that case the question of interest was a subordinate point, and the facts and contentions of the parties in that regard are not disclosed.

It would appear that the case could be read as holding not whether interest was allowable prior to judgment but whether a demand was necessary to start the running of interest. It might also be read as holding that a plaintiff may be entitled to interest where the time of payment is fixed by contract or by law and the amount to be paid is easily ascertainable and the duty to pay plain. In either case, it is not helpful here.

The Engh and Olson cases are the only Wisconsin cases cited by the plaintiff referring in any way to the allowance of interest prior to the date of judgment on an amount recovered by an insured under an insurance policy.

The Engh case was an action by an insured under an automobile insurance policy to recover damages arising out of failure of the insurer to pay a collision loss sustained by the plaintiff to the insured vehicle. The amount of loss sustained was disputed. The trial court held the plaintiff entitled to recover the amount set forth in briefs submitted by his counsel, with interest at the rate of 5% per annum from one month after the plaintiff furnished the defendant with a written proof of loss. The question of the propriety of allowing interest prior to the date of judgment was not discussed by the Wisconsin Supreme Court in its opinion on appeal, nor does it appear that the question was raised.[2]

---

2. Compare with Cassel v. Newark Insurance Company, 1956, 274 Wis. 25, 79 N.W.2d 101; an action to recover under extended coverage indorsements to fire insurance policies, wherein both coverage and amount of loss were in dispute.

In that case, no interest prior to the date of judgment was awarded in the trial court. The failure to allow interest was not questioned on appeal nor discussed by the Wisconsin Supreme Court in its opinion on appeal.

In the Olson case, an action to recover under a fire insurance policy covering plaintiff's buildings, no dispute existed as to the amount of the loss, the insurers' principal contention being that the policy was void by reason of plaintiff's failure to disclose the existence of a mortgage on the insured property in his application for the insurance. The Wisconsin Supreme Court in that case was concerned not with the question of whether interest was allowable prior to judgment, but whether interest was to be allowed from the date of the fire or from the date when the loss was payable, sixty days after proof of loss.

That the Engh and Olson cases are distinguishable from the instant case will appear from a reading of our first opinion and what is hereinafter set out.

It is our opinion that the authorities cited by the plaintiff fail to establish any entitlement on the part of the plaintiff to pre-judgment interest.

■ Although the Wisconsin Supreme Court has never considered the precise problem here presented, that court has set forth the general rule in this state with respect to liability for interest on a contract obligation as follows:

"The general rule is that in the absence of agreement to the contrary, liquidated damages bear interest, whereas unliquidated damages do not. 47 C.J.S. Interest § 19(a), p. 28; Beck Investment Co. v. Ganser, 1951, 259 Wis. 69, 72, 47 N.W.2d 490. In order to recover interest there must be a fixed and determinate amount which could have been tendered and interest thereby stopped; the amount of the claim must be known and determined, or readily determinable. 47 C.J.S. Interest § 19 (b), p. 30. Ordinarily, where the amount of a demand is sufficiently certain to justify the allowance of interest thereof, the existence of a setoff, counterclaim, or cross-claim which is unliquidated will not pre-

vent the recovery of interest on the balance of the demand found due from the time it became due. 47 C. J.S. Interest § 19(b), p. 31. See also Note 3 A.L.R. 809." Maslow Coopperage Corp. v. Weeks Pickle Co., 1955, 270 Wis. 179, 192–193, 70 N. W.2d 577, 584.

Under the aforesaid general rule, the plaintiff is entitled to recover interest only if it is established that there was a fixed and determinate amount which could have been tendered and interest thereby stopped or that the amount of the claim was known and determined or readily determinable. Nothing could be clearer to a court which tried this case for twenty-six days than that there was not a fixed and determinate amount, there was not a claim, the amount of which was known and determined, or one readily determinable. It follows, therefore, that the plaintiff is not entitled to the interest.

■ Throughout the course of this action, the amount of loss suffered by the plaintiff as a result of the fire, and the manner in which the amount was to be ascertained, have been sharply contested. Basically the defendant insurer has maintained that the plaintiff's loss was $668,178.47, and the plaintiff has contended, and still contends that the loss sustained was $1,474,906.38. No agreement was reached at any time concerning the amount of loss.

Nor were the parties in agreement at any time as to the proper measure of damages to be applied in ascertaining the amount of loss. Although the plaintiff could cite no legal authority for its position, it has consistently and doggedly maintained that under Wisconsin law the only proper method of determining the value of the insured property as of the time of the loss was to determine the "replacement value new" of that property and subtract from that figure "observed depreciation." The amount of loss, the plaintiff contends, is arrived at through the use of the resultant figure.

**126**

The defendant insurer, on the other hand, has argued that the court must take into consideration all of the facts and circumstances bearing on value in determining the value of the insured property at the time of the loss and in forming a correct estimate of the loss sustained. This court found no merit in the plaintiff's contention that it was rigidly limited to the application of the formula "replacement cost new less observed depreciation", and as appears from its opinion agreed with the defendant that the court could and should consider a wide variety of factors in arriving at its findings as to the value of the property and the loss sustained by the plaintiff as a result of the fire.

Under the broadest view of the standards set out in the general rule, the claim of the plaintiff must be classed as an unliquidated claim for which it is not entitled to interest. It is laboring the point, but put another way, the lack of merit of plaintiff's contention appears conclusively when we consider that in respect of the damage issue, plaintiff's position has been completely rejected and the amount asserted as its loss has been held to be excessive to the extent of $600,000. To hold as they implicitly must that such amount was a liquidated claim is patently groundless.

As we have heretofore stated, this court devoted twenty-six days to the trial of this case and a substantial majority of that time was devoted to testimony, including that of experts, concerning the value of the insured property on the date of the fire and the resultant loss, including methods and measures to be used in arriving at those results. Not until a 3,000-page transcript had been reviewed in the light of the exhaustive briefs that had been filed, did this court in a 76-page opinion establish the law and facts of this case.

For the above and foregoing reasons the judgment entered in this case will not provide for the allowance of interest from the date of the fire.