AFRAM EXPORT CORP., a Wisconsin
corporation, Plaintiff,

v.

METALLURGIKI HALYPS, S.A., a
foreign corporation, Defendant.

No. 80–C–0262.

United States District Court,
E.D. Wisconsin.

Aug. 2, 1984.

Walter F. Kelly, Milton Shinken, Shinken & Shinken, Milwaukee, Wis., for plaintiff.

Michael Bowen, Foley & Lardner, Milwaukee, Wis., John H. Gross, Anderson, Russell, Kill & Olick, P.C., New York City, for defendant.

## DECISION AND ORDER

WARREN, District Judge.

This is a suit for breach of contract wherein plaintiff, a Wisconsin scrap processor and dealer alleges a contract for the purchase of approximately 15,000 tons of shredded iron scrap to a Greek steel producer. The purchase was never consummated and plaintiff sued. Defendant filed a counterclaim.

On November 26, 1980, the Court denied defendant's motion for dismissal for lack of personal jurisdiction and insufficiency of service of process after finding that the defendant had purposely availed itself of the privilege of conducting business in Wisconsin by sending a surveyor, who the Court found to be the defendant's agent, to Wisconsin to inspect the scrap. Thereafter defendant sought reargument and reconsideration, or in the alternative, certification for appeal under Section 1292(b). These requests were rejected by the Court in an order dated May 28, 1981, and the case moved forward through protracted discovery characterized by a great deal of delay, bickering and disputation.

Ultimately trial was held to the Court on October 13, 14, 15, and 19, 1982. There were numerous delays in submitting post-trial briefs and proposed findings, but all have now been in for some time and the matter is due for decision.

At the outset of the trial, plaintiffs moved to dismiss defendant's counterclaim for failure of the defendant to provide discovery. The Court took this matter under advisement pending the trial. Now, the Court having heard the evidence and the defendant having offered no testimony in regard to George Anastassopoulos' refusal to submit to a deposition in New York as ordered, the Court does grant the motion to dismiss defendant's counterclaim with prejudice. The following shall constitute the Court's findings of fact and conclusions of law regarding the complaint pursuant to

Rule 52 of the Federal Rules of Civil Procedure:

Plaintiff, Afram Export Corporation, a Wisconsin corporation (hereinafter Afram), is a dealer in export contracts for the sale of steel and other metal scraps. It is a wholly-owned subsidiary of Afram Brothers Company, likewise a Wisconsin corporation, and both firms have their offices and principal place of business in Milwaukee. Yet another company associated with the above two was Afram Metal Processing Company, Inc., which concentrates on shredding old automobiles and sheet scrap. It also has its office in Milwaukee. Principals Zeke Afram, Israel Afram and Lennard Afram were all officers in the three corporations and active during the events at issue. Zeke Afram died prior to the time of the trial.

Defendant Metallurgiki Halyps, S.A. (hereinafter Halyps), is a Greek corporation engaged in the business of manufacturing steel from scrap. Its offices are located in Athens, Greece, and its principal officer at the time of the trial was George Anastassopoulos.

During 1979 a Paminos Anastassopoulos, son of George Anastassopoulos, and an officer of defendant corporation, was in the United States buying scrap steel to supply his firm's steelmaking operations: In February of that year, Afram had received a telephone call from a Mr. Gratsos in New York. Mr. Gratsos was an old acquaintance of Israel Afram. He apparently was an employee of the Onassis shipping operation in the office of the Victory Carrier super tanker, and in several visits urged upon Israel Afram that Metallurgiki Halyps used a lot of shredded scrap and might be an excellent long term customer for Afram.

After some preliminary conversations on the telephone with Paminos Anastassopoulos, Afram received a telex dated February 9, 1979, from Halyps which read as follows:

Following your telephone agreement with our Mr. Epam [sic] Anastassopoulos, we confirm having purchased from you fifteen thousand tons of clean shredded scrap at the price of U.S. dollars 135 (One Hundred Thirty-Five) per M/T F.O.B. Milwaukee, for delivery end April.

Loading Rate: Tons 2500/day No Dispatch

Payment: By confirmed irrevocable L/C. Please telex confirm.

(Plf. Ex. 4). On February 10, 1979, Afram responded with a telex:

As per our phone conversation of February 8, 1979, we confirm sale to you as follows:

Quantity: 13,000 to 15,000 M.T.

Quality: Shredded Scrap to ISIS Code # 211.

Price: $135.00 per metric ton (One Hundred Thirty Five Dollars per metric tons) U.S. Funds.

Shipment: April 1979. If buyer does not provide a vessel by May 15, 1979, seller shall be permitted to draw 50 (fifty) percent of letter of credit.

Loading Rate: 2500 tons per WWDSSHEX (unintelligible on telex) even if used. Draft weight at Milwaukee to govern.

Payment: For the account of Afram Export Corporation. 100 percent confirmed, Irrevocable letter, divisible—with partial shipment permitted. Payable at sight and negotiable to our bankers, First Bank-Midland, 201 West Wisconsin Avenue, Milwaukee Wisconsin, in the amount of 2,025,000.00 (Two Million, Twenty Five Thousand Dollars) payable on presentation of Invoices and Loading Documents. Letter of credit to be valid.

Please send us your formal purchase contract confirming to our terms.

Scrap may be inspected at our dock or our shredder yard. Material is on hand.

It is necessary that you expedite the letter of credit as we must transfer the material for shipment to our dockside from shredder storage which is one mile from our marine dock location. This entails a lot of work and time to

transport this shipment via truck from its present location.

As agreed, we will pay your surveyors expense in Milwaukee. We will also have our surveyor work with him. The water dept at our dock last December when we loaded the "M/V Brunto" was to twenty five and one-half feet, which might be the maximum we can load at our dock unless the water data increases. Guide yourself accordingly. (Plf. Ex. 5)

Thus the buyer said (Plf. Ex. 4) ... "we confirm having purchased ..." on February 9; the seller on February 10 said (Plf. Ex. 5) ... "we confirm sale to you ..." Defendant's brief calls plaintiff's exhibit 5 a counteroffer. It sounds to the Court like an acceptance. If there is any doubt as to the existence of a binding contract for the sale of goods, it is surely obliterated by the telex which Halyps sent back to Afram on February 15, 1979, (Plf. Ex. 6) wherein the buyer said:

Mr. Anassaopoulos who is abroad, informed us that you can consider the order booked ..." and did not change any of the detailed specifications of Afram's telex of February 10.

■ Section 402.201(1) Wis.Stats., provides that, under Wisconsin's Uniform Commercial Code, a contract for the sale of goods is unenforceable unless there is "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." The official UCC Comment to this section makes it clear that:

Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be "signed," a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

It is the Court's opinion and express finding that with the exchange of the above telex messages the parties had brought into being a valid binding contract. Those variances which did exist as to certain detail terms, i.e., Halyps use of the term "clean shredded scrap" as contrasted to Aframs "shredded scrap to SIS Code # 211 and Halyps "15,000 tons" to Afram's "13,000 to 15,000 M.T." cease to be variances after Halyp's telex of February 15 (Plf. Ex. 6) since under Section 402.207 Wis.Stats. the Wisconsin version of the UCC provides:

402.207 Additional terms in acceptance or confirmation

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional or different terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it;

The figures in Afram's telex of February 10 would be construed as proposals for additions to the contract, agreed to by Halyp's telex of February 15.

Having arrived at a contract, the most immediate concern of the parties was the financial arrangements for payment. Payment was to be in United States dollars (Plf. Ex. 5) to the account of Afram Export Corporation. This required an irrevocable letter of credit and the submission of a pro-forma invoice, the latter being necessary so that it could be submitted to the Greek government to obtain the requisite amount of currency clearance for the letter of credit.

Arrangements for seeing that 15,000 tons of scrap was shredded and on hand; that it was transported from the yard at 260 North 12th Street, Milwaukee, Wisconsin, to the loading dock at 900 South Water Street, Milwaukee; that a vessel was there

to load it without delay; and as to what compensation would be paid to Afram if the buyer could not pick up the load by May 15, 1979; as well as details respecting payment, were all discussed and dealt with in the telexes which passed between the parties in the period from February 15 through March 17. (Plf. Ex. 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17.)

During the exchanges noted above, it was agreed that Afram would pay for the travel and expenses of Halyps' surveyor, Roger G. Shields, a former employee of Halpys who at this time was a surveyor servicing Halyps and other companies.

At this point in these findings, the Court digresses to explain why the roles of Roger Shields and George Anastassopoulos made this trial so different. Roger Shields was throughout a man of mystery. There is no doubt that during negotiations and the early stages of this affair Roger Shields was defendant's man. Indeed, it was largely based on that relationship and Shield's trip to inspect the scrap that the Court found those "minimum contacts" in Wisconsin to support the exercise of jurisdiction. If one gives credence to his affidavit filed with defendant's motion for dismissal, he came to the United States and left the employment of Halyps in November 1978. He then said his residence was in Missouri where he was a rancher. Yet in April 1979 he was being given various instructions by George Anastassopoulos in New York and his service with Anastassopoulos was confirmed by inquiries plaintiffs made of a Dick Schwartz of Luria Brothers and a Peter Vagliano, Vice-President of the Shiavone Bonomo Corporation (Tr. 348, 349). He did come to Milwaukee on April 12, 1979, to inspect the scrap set aside to the contract. After the lawsuit was commenced, on May 13, 1982, while heated discovery in the case was supposedly underway, the Court's law clerk received a telephone call from New York by one who said that he was Roger Shields. The caller alleged that he had been threatened by defendants' agents that if he did not testify on defendant's behalf in some manner that Shields considered perjurious, something

bad would happen to his wife's family who still lived in Greece. He contended that he had complained to the F.B.I. but they were doing nothing. Contact was made with both plaintiff's counsel and defendant's New York counsel. (Defendant's local trial counsel was then abroad in England). After discussing the case it was agreed that defendant's counsel would immediately get in touch with Paminos Anastassopoulos and put a stop to any such intimidation, if it was, in fact, occurring. Surprisingly, the Court never heard anything further of this matter. Shields, despite his central role in the controversy did not testify at the trial, both sides indicating that they had no knowledge as to his whereabouts. (Tr. 198–202). But Shields' statements and actions in the trial record as well as those of George Anastassopoulos and his son Pamino are such that the Court has been compelled to make a determination as to the credibility of both Shields and George and Paminos Anastasspoulos without ever seeing any of the three in person and without having heard one word of testimony from them. The circumstances surrounding the failure of George or Paminos Anastassopoulos to testify are similarly bizarre. No explanation was made for the non-appearance of Paminos Anastassopoulos. At the conclusion of plaintiff's case, defense counsel announced that the only testimony defendant would offer would be that of George Anastassopoulos, if it could be procured. The proposal had been advanced at the outset of the case that the record should be held open to permit the receipt of a video tape of this witness' testimony to be made in New York at the earliest opportunity. This proposal was initially taken under advisement but then later denied by the Court. In doing so on October 14, however, the Court did grant defendant a continuance through October 21, coupling the continuance with a sequestration order that Mr. George Anastassopoulos was not to be instructed on the testimony adduced to date prior to his appearance to testify. (Tr. 321, 322).

Prior to October 21, defense counsel sought a hearing at which time he advised the Court and counsel opposed that Anastassopoulos was required by Greek law to be in that country during certain municipal elections on October 17 and that he would have been subject to hardship in coming to testify during the four-day delay granted. He therefore sought a further continuance. This was denied by the Court. Subsequently, the case was closed.

With this digression, the Court returns to its history and findings regarding the transaction.

On April 7, 1979, Lennard Afram met with George Anastassopoulos and his son Paminos in New York. Roger Shields was also present. By this time, scrap steel prices were dropping rapidly and there was discussion as to the then prevailing price. Afram testified that from observations he made at that meeting, Shields seemed to be an employee of Halyps, that he was given various instructions by Anastassopoulos during the meeting including the order ... "to come to Milwaukee, check the cargo, everything was all right, charter a ship and set up a letter of credit." (Tr. 347). Afram returned to Milwaukee on Tuesday, April 10, and called Shields on Wednesday, April 11. Shields came to Milwaukee on Thursday, April 12. He was picked up at the airport and spent four to five hours here before reboarding for New York. (Tr. 350). Lennard and Israel Afram accompanied him during the visit. Mr. Dan Voltz, Comptroller for Afram, was also present during a portion of the visit. Shields made the statement to the Aframs that he was an employee of Halyps. He inspected at the dock a pile of about 2,000 tons of shredded scrap that had been trucked from the processing yard to the loading dock. He also inspected some of the shredded scrap at the processing yard, spending 10–15 minutes looking at the pile in the processing yard and a period of about five minutes on the loading dock. He told Lennard Afram that the scrap was good and that he found it "comparable to other shredded scrap that he had inspected or taken." He said that the Afram shredded scrap compared to the scrap of the Hugo New Company and the Shiavone Bonomo Company whose scrap he had taken. (Tr. 352). However, Lennard Afram testified that, in the process of returning to the airport, Shields also indicated his unhappiness with his employment with Halyps and told the Aframs that his trip to Milwaukee was wasted, "that Metallurgiki Halyps would never take the cargo, the market had just fallen too far...." He did indicate that "under pressure or duress Halyps might take 5, 6 or 7 tons thousand if they (Afram) were lucky." (Tr. 353).

On April 16, 1979, Halyps sent a telex (Plf. Ex. 18) to Afram:

RE: SCRAP PURCHASE

HAVE RECEIVED FROM MR. ROGER SHIELDS CABLE READING AS FOLLOWS:

Q U O T E

12 APRIL 1979 INSPECTION REPORT AFRAM BROTHERS MILWAUKEE WISCONSIN

THIS IS TO INFORM YOU THAT THIS DATE I PERFORMED THREE INSPECTIONS OF SHREDDED SCRAP ISIS (this is how telex is) 211 AND ALTHOUGH MATERIAL IS EXTREMELY DENSE AND RELATIVELY FREE OF NONFERROUS METALS, DUE TO INCLUSION OF CLOTH, RAGS, RUBBER AND DIRT I FEEL THAT SUBJECT MATERIALS MIGHT WELL DAMAGE THE INTEGRITY OF YOUR PRODUCT THEREFORE I REJECT THE ABOVE MATERIAL FOR SHIPMENT

U N Q U O T E

AS ABOVE REPORT CREATES PROBLEMS AND WE ARE IN NEED OF MATERIAL CONCERNED, WE SHALL HAVE TO WAIT UNTIL WEDNESDAY WHEN MR. GEORGE ANASTASSOPOULOS WILL BE BACK IN ATHENS.

Thus did Shields' prediction come to pass. On the same day, Afram fired back a response (Plf. Ex. 19) as follows:

YOUR CARGO OF SHREDDED SCRAP CONFORMS TO ISIS SPECIFICATION 211.

TOTAL TONNAGE IS READY FOR SHIPMENT. SEVERAL THOUSAND TONS OF SHREDDED SCRAP IS PLACED ON OUR DOCK FOR LOADING AT THE PRESENT TIME.

WE HAVE SHIPPED IDENTICAL MATERIAL TO DOMESTIC AND FOREIGN CONSUMERS WITHOUT ANY PROBLEMS.

WE EXPECT YOU TO FULFILL YOUR CONTRACTUAL OBLIGATIONS IN REGARDS TO THIS TRANSACTION.

On April 17, Halyps sent a message (Plf. Ex. 20) pointing to the "clean shredded scrap" statement in its first telex and quoting part (and omitting a relevant portion) of the general conditions standard from the specifications handbook of the Institute of Scrap Iron and Steel, Inc. (Plf. Ex. 1). Halyps also reiterated its rejection of the shipment.

On April 18, George Anastassopoulos, noting that he had just returned from abroad, telexed (Plf. Ex. 21) that he was "prepared to examine every possibility to close the business without of course prejudice to our production and to the quality of our products which means that the scrap must be clean." He then went on to propose:

I THEREFORE SUGGEST THAT WE ESTABLISH THE CREDIT FOR 70& [sic] OF THE PRICE AND A SURVEY BE CARRIED OUT BY MR. R. SHIELDS AT OUR PLANT IN OUR PRESENCE REJECTING FOREIGN MATERIAL AND NOT CLEAN. AND THEN ESTABLISH YOUR INVOICE ON THE ACCEPTABLE MATERIAL WHICH WE SHALL SETTLE TO THE FULL. EXPENSES OF COURSE FOR THIS SURVEY AND THE SORTING WILL BE BORNE BY YOU WHEN THE UNDERSIGNED MET MR. I. AFRAM IN NEW YORK WE PARTICULARLY STRESSED THIS POINT OF CLEANNESS TO HIM. I HOPE YOU ACCEPT THIS SOLUTION SO AS TO START OUR COLLABORATION.

After hearing Shield's comments regarding Halyps, Afram, during his inspection visit, had engaged Superintendence Company, Inc. of New York, to make an independent survey of the scrap. That firm dispatched Sidney Slaton to Milwaukee and he arrived on April 18, 1979. He spent several hours inspecting the same shredded scrap which Afram was processing for Halyps. He found that scrap to be satisfactory and in conformity with ISIS specifications for Code 211 (Tr. 30). He found the non-ferrous and non-metallic materials in the shredded scrap to be negligible. He took handwritten notes of his conclusions. These findings were later formalized in a Superintendence Certificate (Plf. Ex. 2) which certified that the materials met ISIS 211 and included the statement:

In our opinion, foreign matter and off-grade material was considered negligible and did not exceed the tolerable commercial limits of Institute of Scrap Iron and Steel recommendations.

During his trial testimony Slayton also testified that in the trade "clean" meant that standard set out in the general specifications for cleanness in the ISIS Specifications Manual (Ptf. Ex. 1) which provides:

Cleanness. All grades shall be free of dirt, non-ferrous metals, or foreign material of any kind, and excessive rust and corrosion. However the terms 'free of dirt, non-ferrous metals or foreign material of any kind' are not intended to preclude the accidental inclusion of negligible amounts when it can be shown that this amount is unavoidable in the customary preparation and handling of the particular grade involved.

The use of the term itself was superfluous in connection with any ISIS specification. He also said that he had viewed the operation of the Afram shredder and testified that the provision of two Afram employees on the shredder line for the additional purpose of seeing to the further removal of foreign material was unique within the industry (Tr. 23).

Slayton also testified in response to a hypothetical question regarding an inspection of the same identical shredded scrap two days prior to his inspection that in his

opinion, a rejection for non-conformance to standards for "clean shredded scrap" would have been improper (Tr. 44).

When George Anastassopoulos suggested in his telex of April 18 (Plf. Ex. 21) that a credit be established for 70 percent of the sales price and that Shields do a further inspection at the Halyps plant which would be binding on both sides, Afram responded that it "cannot accept your modifications to the contract for sale of shredded scrap." It also referred to the inspection that day by "an independent national concern who reports the material is shredded scrap within ISIS specifications" and also reported that this concern reported that their "shredded scrap meets ISIS specifications for cleanliness" (Plf. Ex. 22).

Between April 18 and May 18 of 1979, the parties exchanged numerous telex messages reiterating their respective positions. (Plf. Ex. 23, 24, 25, 26, 27, 28, 29, 30, 31 and 32).

By May 30, 1979, Afram was convinced that the sale could not be salvaged and accordingly dispatched a telex (Plf. Ex. 33) which gave notice to Halyps of Afram's intent to offer the goods at public sale at 10:30 A.M. on June 15, 1979, at the Afram yard at 260 North 12th Street, Milwaukee. The notice referred to the Uniform Commercial Code and Chapter 402 of the Wisconsin Statutes. The notice complied with the requirements of Wis.Stats. § 402.-706(4).

In a phone conversation on June 12, Paminos Anastassopoulos made an offer to Afram to buy the 15,000 metric tons at $118.00 per ton. Viewing this as just another effort by Halyps to avoid the impact of the falling scrap market, Afram found it unacceptable (Plf. Ex. 39 & 40), although there was a suggestion that the principals might meet in New York to settle their differences. Apparently one or more such meetings did occur without success (Tr. 260).

Afram placed a Notice of Sale ad in the American Metal Market which was consistent with its notice to Halyps (Plf. Ex. 36). The dates of scheduled publication were June 6 and June 11 for a sale scheduled at 10:30 A.M. on June 15. I. Afram sent Mr. C. Gratsos at Victory Carriers a letter on June 6 enclosing a copy of the ad (Plf. Ex. 37 & 38).

It is at this point in the chronology of events that we encounter some of the most vigorously disputed issues of the case. On June 15 Afram conducted a public sale to establish its damages pursuant to the relevant section of the Uniform Commercial Code. Defendant contends that the sale at which Afram Metal Processing purported to buy the scrap from Afram Export was a sham and that the scrap had already been sold on June 4 to Luria Brothers. As part of this controversy, defendant notes that in its sworn answers to interrogatories plaintiff failed or neglected to disclose the June 4, 1979, sale to Luria. At trial plaintiff acknowledged that this had occurred but said it was a clerical oversight which had occurred because the June 1979 transaction was made by decedent Zeke Afram who died in September 1980 and not through any intent to mislead. The pertinent facts seem clear enough.

Mr. Donald Forloni, who testified at trial for the plaintiff, is Vice-President, Midwest Region, of Luria Brothers and Company, Northbrook, Illinois. That firm is a nationwide dealer in metal scrap. Forloni was stipulated to be an expert in the metal scrap industry. He had made many previous purchases of scrap from Afram and said he found their shredded scrap to be of high quality. He also testified that ISIS was the only national or international index for rating scrap that he was aware of.

He further testified that within the industry, adding the word "clean" to shredded scrap did not change the specification of quality and that when he had bought and sold iron and steel at grades not listed in the ISIS handbook, the contract would have a specific description of what the material was that was being bought or sold. He was contacted by decedent Zeke Afram sometime in May of 1979. Afram told him that earlier that year there had been a sale of shredded scrap to a Greek steel compa-

ny, that they were now renigging on the sale, and consequently Afram needed to resell the material. He asked that Forloni negotiate to do that with Inland Steel (Tr. 93).

Forloni approached Inland Steel and was successful in arranging a sale for roughly 20,000 tons of shredded scrap to them at $120.00 per gross ton. This purchase is reflected in Def. Ex. 1 and bears a date of May 31, 1979.

On June 4, 1979, Luria procured part of the scrap needed for its sale to Inland Steel from Afram. The document representing this transaction is D's. Ex. 2, a Purchase Confirmation by Luria of 10,000 gross tons of shredded scrap at $118.00 a gross ton, F.O.B. Indiana Harbor. Forloni testified that the difference between the $118.00 and the $120.00 was his commission. The cost of shipping the scrap to Indiana Harbor was $7.05 per gross ton, thus reducing the net proceeds to Afram to $110.95 per ton. Pursuant to this sale, Afram actually shipped 10,158 gross tons.

When the projected sale was conducted on June 15, 1979, Afram received bids from the Mark Rich Company at $100 per metric ton loaded in vessels and either $91.00 or $92.00 per metric ton loaded in gondola cars from the Erman Howell Corporation. Afram Metal Processing bid $102.75 per metric ton which was the highest bid. Thereupon, Afram was supposedly awarded the sale.

On September 15, 1979, Afram sold 7,572.65 gross tons of its shredded scrap to International Traders, Inc. of Stanford, Connecticut at $103.00 per gross ton (Plf. Ex. 45). Lennard Afram testified that of the material that was identified to the Halyps contract, the only actual sales to parties other than the June 15th sale to an Afram sister company were the sales to Luria Brothers and the sale to International Traders.

Under the contract between the parties, the scrap was to be shipped in April 1979 with a 50 percent draw on the letter of credit if the buyer did not provide a vessel by May 15. The first indication of non-acceptance by the purchaser was the telex of April 16 (Plf. Ex. 18).

■ On that very same day, Afram notified Halyps that the total tonnage was "ready for shipment" and that "several thousand tons of shredded scrap is placed on our dock for loading at the present time." (Plf. Ex. 19). The defendant contends in its post-trial brief that Afram did not have 15,000 metric tons on hand and that is why it sold 10,158 gross tons to Luria Brothers. But there is no evidence to that effect and plaintiff asserts (Plf. Ex. 19) the contract amount was ready for shipment. Lennard Afram also avers that plaintiff had "more than 15,000 tons on hand.) (Tr. 401). The Court concludes that the shredded scrap was produced, on hand, and identified to the contract. The Court further concludes that the shredded scrap was acceptable under the contract.

Having concluded that the non-acceptance by Halyps was not justified and represented a refusal by Halyps to follow through on the agreement in a falling market (Tr. 358–360), this Court finds breach of contract by Halyps and turns to Wis.Stat. § 402.703 for the options available to the aggrieved seller:

**402.703  Seller's remedies in general**

Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (s. 402.–612), then also with respect to the whole undelivered balance, the aggrieved seller may:

(1) Withhold delivery of such goods;

(2) Stop delivery by any bailee as provided in s. 402.705;

(3) Proceed under s. 402.704 respecting goods still unidentified to the contract;

(4) Resell and recover damages as provided in s. 402.706;

(5) Recover damages for nonacceptance (s. 402.708) or in a proper case the price (s. 402.709);

(6) Cancel.

Here, of the six options available to it, Afram chose (4)—to resell and recover damages as provided in Wis.Stat. § 402.706.

That provision provides:

**402.706 Seller's resale including contract for resale**

(1) Under the conditions stated in s. 402.703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under s. 402.710, but less expenses saved in consequence of the buyer's breach.

(2) Except as otherwise provided in sub. (3) or unless otherwise agreed resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms musts be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell.

(4) Where the resale is at public sale:

(a) Only identified goods can be sold except where there is a recognized market for a public sale of futures in goods of the kind; and

(b) It must be made at a usual place or market for public sale if one is reasonably available and except in the case of goods which are perishable or threaten to decline in value speedily the seller must given the buyer reasonable notice of the time and place of thee resale; and

(c) If the goods are not to be within the view of those attending the sale the notification of sale must state the place where the goods are located and provide for their reasonable inspection by prospective bidders; and

(d) The seller may buy.

(5) A purchaser who buys in good faith at a resale takes the goods free of any rights of the original buyer even though the seller fails to comply with one or more of the requirements of this section.

(6) The seller is not accountable to the buyer for any profit made on any resale. A person in the position of a seller (s. 402.707) or a buyer who has rightfully rejected or justifiably revoked acceptance must account for any excess over the amount of his security interest, as defined in s. 402.711(3).

■ Where the resale is made in good faith and in a commercially reasonable manner, the seller may recover the difference between the resale price and the contract price together with any incidental damages, but less expenses saved by the buyer's breach. Afram, on May 30, gave Halyps notice of its intention to resell the scrap at *public* sale on June 15. However, the scrap market continued to drop and meanwhile Lennard Afram had had his discussions with Luria Brothers and Luria succeeded in arranging a sale of 20,000 gross tons to Inland and on June 4, 1979, Afram sold 10,158 gross tons to Inland at a *private* sale at 118.00 per ton (120.00 less 2.00 per ton commission). This was scrap that had been identified to the Halyps contract. This sale was one that plaintiffs had not revealed in interrogatory answers. Eleven days later, Afram conducted its public sale pursuant to notice. In the interim, the market continued to drop with the result that the bids were $100 and $91–92 per ton with Afram selling to its sister company for $102.75 a ton. One of the bitter issues of this trial has been the effect, if any, of this sale on June 15 when two-thirds of the goods had already been sold at a higher market price on June 4.

456

Defendant contends most strenuously that the sale on June 15 was a "sham" and that the plaintiff should not be permitted to actually sell two-thirds of the goods on June 4 at $118, wait for the market to continue its drop, and then go through the pretense of selling the already-sold shredded scrap to itself at $102.75 on June 15 to establish a market price that increases the loss attributable to the breach. The Court agrees.

■ For one thing, section 402.706(4)(a) requires that where the resale is at public sale, only identified goods can be sold except where there is a recognized market for a public sale of futures in goods of the kind. The Court is unaware that such exists for shredded scrap and further the identified goods had already been largely disposed of. The Court opines that Afram must be deemed as a matter of law to have abandoned its projected *public* sale and opted for a *private* resale on June 4 when it sold 10,158 tons of identified goods to Luria Bros.

■ In this connection, it is noted that section 402.706(3) requires that "where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell." The Court believes that the notice of May 30, although it spoke in terms of a public sale was "reasonable notification of his (Afram's) intention to resell." Buttressing this finding is the fact that both parties were well aware of the steadily falling market for shredded steel scrap. Hence, any resale which occurred prior to the June 15 date, as long as it was made in good faith and in a commercially reasonable manner (Sec. 402.706(1)) would rebound to the benefit of defendants as the price would be closer to the $135 per ton price of the contract. Accordingly, the Court determines that the 10,158 gross tons sold to Luria Brothers constituted a good faith and commercially reasonable resale to establish damages. The "public" sale of June 15 will be disregarded in determining damages as it, in this Court's opinion, could not meet the statutory requirements of good faith and commercial reasonableness.

Afram had 15,000 metric tons identified to the contract. It disposed of 10,158 gross tons or 10,323 metric tons to Luria Bros. at $118 per gross ton, F.O.B. Chicago (Indiana Harbor) on June 4. This meant it had 15,000–10,323 or 4,677 metric tons still to resell. This was accomplished with the private sale of the balance of the identified goods to International Traders on September 15, 1979. This established a damage determining price of $1.03 per gross ton or $1.0134 metric ton F.O.B. Milwaukee.

Therefore, pursuant to 402.706, Afram is entitled to the difference between the resale price on the 15,000 metric tons and the contract price together with any incidental damages allowed under 402.710, but less expenses saved in consequence of the buyer's breach.

Afram had 15,000 metric tons identified to the contract. It disposed of 10,158 gross tons or 10,323 metric tons to Luria Bros. at $118 per gross ton F.O.B. Chicago on June 4, 1979. This part of the resale price is thus $1,198,644 for the Luria transaction. This meant Afram still had 15,000–10,323 or 4,677 metric tons still to resell if, as the Court feels it must be, the June 15 sale is disregarded. This was accomplished with the private sale of 7,572.65 gross tons (the balance of any identified scrap plus additional tonnage) to International traders on September 15, 1979. Such sale established a damage determining resale price of $103 per gross ton (or $101.34 per metric ton) F.O.B. Milwaukee times 4,601 gross tons (or 6,477 metric tons) to total $473,903 for the International Traders transaction.

■ Therefore, pursuant to 402.706(1), Afram is entitled to the difference between the resale price which the Court finds to be:

| Luria Bros. | 10,158 gross tons | | |
|---|---|---|---|
| F.O.B. Chicago | (10,323 metric tons) | | |
| 6/4/79 | @ $118.00 per gross ton | | =$1,198,644 |
| | | | |
| International Traders | 4,601 gross tons | | |
| F.O.B. Milwaukee | (4,677 metric tons) | | |
| 9/15/79 | @ 103 per gross ton | | =$ 473,903 |
| | Total Resale Price $1,672,547 | | $1,672,547 |

and the contract price which the Court finds to be $2,025,000, together with any incidental damages recoverable under 402.-710, less any expenses saved in consequence of the buyer's breach. There was actually relatively little proof in either of these latter two categories. There was clear testimony that the Luria sale was F.O.B. Chicago. This resulted in a $7.05 per gross ton freight charge which sellers had to bear in order to make this resale. This creates a $71,613 charge to buyer. Further costs proven up were $750.00 paid to Superintendence Company, Inc. for the inspection and certification. (Plf. Ex. 48) and $333.00 paid to Fairchild Publications for the ads in the American Metals Market publication (Plf. Ex. 36). The Court finds this item to be recoverable as incidental damages since it represented an effort to comply with the UCC provisions even though the Court decided to ignore the results of that sale in arriving at a resale figure.

The Court is unaware that any proof was offered as to expenses saved in consequence of the breach. Hence, the sum recoverable by Afram is calculated by the Court to be:

| | |
|---|---|
| $ 2,025,000.00 | Contract Price |
| − 1,672,547.00 | Total resale price in Luria and International Trader sales |
| 352,453.00 | Recoverable under Sec. 402.706 |
| + 71,613.00 | Freight recoverable under Sec. 402.710 |
| + 750.00 | Superintendence Inspection Charge |
| + 333.00 | Amer. Metals Market ads |
| $ 425,149.00 | Total recovery to which Afram is entitled |

■ During its case-in-chief plaintiff put in as incidental damages under 402.710, a computation of interest at one-half percent over prime on the sum of $483,750.00 which Afram contended its damages were resulting from the difference between the contract price of 15,000 × 135 or $2,025,000 and the "public sale" market price of 15,000 × 102.75 or $1,541,250. This calculation from June 15, 1979, to date of trial was $271,129.00 (Plf. Ex. 49). It also calculated interest (12.25%) on the contract price of $2,025,000 from April 18, 1979, to June 15, 1979, at $40,654.54 (Plf. Ex. 49a). The Court understands that the $271,129 set forth in Plf. Ex. 49 represents interest paid to First Bank-Milwaukee. Lennard Afram testified (Tr. 374) "we borrowed the money from the bank to buy the cars, to put up the money for the cargo." In other words plaintiff contends that it bought autos to be shredded into scrap and paid interest on the money it borrowed to purchase the raw material (junk cars). It expected to recoup this interest by the sale to Halyps and seeks reimbursement for the cost of carrying the loan to the date of trial. This is erroneous in that it lacks a basis in the law. Moreover it is not intellectually justifiable. Sec. 402.710, Wis.Stats. provides for the recovery of "incidental damages" to an aggrieved seller. Examples are enumerated in the code as:

> . . . any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

■ However so-called "consequential damages" are not recoverable by the Seller under the Code. *See* 2 R. Anderson, Uniform Commercial Code § 2–710:3, 2–708:15 (2d ed 1971). The distinction between "incidental" and "consequential" may not always be crystal clear but Judge Neaker put it well in *Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corporation*, 372 F.Supp. 503 (1974) where he noted that:

> While the distinction between the two is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably

foreseeable by the breaching party at the time of contracting.

The common law of consequential damages stems from the renowned case of *Hadley v. Baxendale,* 156 Eng.Rep. 145 (Ex. 1854). It introduced a concept of contemplation or foreseeability into the law of damages that remains to this day. It would appear clear to this Court that whether or not Afram had to borrow money in order to purchase the raw material for the production of its product, i.e. shredded scrap, is not something contemplated by the parties or which could be foreseen by Halyps. This is merely a cost of doing business, not an item of incidental damages attributable to the breach by Halyps. Presumably the interest costs for the money to purchase the junk cars would be recovered when the scrap which they had become was sold to some purchaser. Halyps breached and did not become this purchaser. But Luria Brothers and International Traders came in as purchasers on the resale and the theory of the law would make Afram whole as to this cost of raw materials through the award of the difference between the contract price and the resale price. Since the Court views the interest paid to First Bank-Milwaukee as an ongoing cost of doing business it will decline to include any interest component in the award as incidental damages.

■■■ Afram also seeks prejudgment interest. In a diversity action the allowance of interest is governed by state law, *Robert C. Herd & Company v. Krawill Machinery Corporation,* 256 F.2d 946, 952 (4th Cir.1958), aff'd 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820. Where the sum at issue is not liquidated or the parties are not in agreement as to the proper measure of loss, the injured party is not entitled to prejudgment interest under Wisconsin law. *Wisconsin Screw Company v. Fireman's Fund Insurance Company,* 193 F.Supp. 96, 125 (E.D.Wis.1961); *City of Merrill v. Wenzel Brothers, Inc.,* 88 Wis.2d 676, 697, 277 N.W.2d 799 (1979). Only where the amount of recovery is fixed and determined can pre-judgment interest be allowed.

Here, not only have the parties litigated the measure of damages most strenuously, but the Court has disallowed the "public sale" by which plaintiff would have measured its loss. No prejudgment interest is justified.

■■■ Finally, plaintiff seeks attorney's fees under Sec. 814.025 Wis.Stats., relating to frivolous claims and counterclaims. Plaintiff contends that the counterclaim offered by defendant's president, George Anastassopoulos obviously was frivolous and intended to harass since Anastassopoulos did not see fit to show up and present his claim. The defendant notes that the standard for determining frivolity is an objective one of what a reasonable attorney would have done under the same or similar circumstances, *Hessenius v. Schmidt,* 102 Wis.2d 697, 307 N.W.2d 232 (1981) and opines that the defendant cannot be expected to have been unable to present his counterclaim because of the courts rulings with respect to a video deposition, an adjournment, or to the unfortunate timing of a Greek election. Defendant's counsel contends the question is whether pursuance of the claim was "objectively unreasonable in light of the facts that were known or should have been known at the time the decision to pursue the claim was made. *State v. State Farm Fire & Casualty Co.,* 100 Wis.2d 582, 302 N.W.2d 827 (1981). The Court agrees. Despite the strange circumstances surrounding this case which have already been referred to, the Court is confident that defense counsel would not countenance frivolous activity and, based on what was known at the time the counterclaim was interposed this Court is unwilling to make that objective finding of bad faith as to his client that would be required under the pertinent statute.

■■■ On the other hand, the Court rejects the defendants arguments that it deprived Anastassopoulos of his due process rights by refusing to adjourn the case until after this "election" in Greece. The demand to hold the trial over was untimely and the Court remains unconvinced on the material presented to it that there was an

election or that Anastassopoulos had to be in Greece at the time in question.

Likewise, the Court rejects defendant's demand that it penalize plaintiff for the failure to disclose the sale to Luria Brothers by decreasing any damages award by fifty (50%) percent.

Accordingly, the Court **DISMISSES** defendant's counterclaim and **FINDS** Halyps liable to Afram in the sum of Four Hundred Twenty-Five Thousand, One Hundred Forty-Nine ($425,149) Dollars, together with the costs and disbursements of this action and **ORDERS** judgment in accordance herewith.